903 P.2d 1289

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Paul D. ROBINSON, Jr., also known as Paul D. Robinson and Paul Robinson, Defendant–Appellant.**

**No. 18478.**

Supreme Court of Hawai'i.

Oct. 17, 1995.

Deborah L. Kim, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

## OPINION

KLEIN, Justice.

Defendant–Appellant Paul D. Robinson, Jr., was convicted on July 20, 1993, of second degree murder under Hawai'i Revised Statutes (HRS) § 707–701.5(1) (Supp.1992).[1] Robinson subsequently filed this timely appeal. He contends that the circuit court committed prejudicial error in admitting certain evidence. We disagree and affirm.

## I.

On January 29, 1993, Robinson killed his live-in girlfriend, Irene Bowles, by asphyxia-tion. At trial, Robinson asserted the mitigating defense of "extreme mental or emotional disturbance manslaughter" or, in the alternative, "reckless manslaughter." Robinson did not testify at trial, but audiotaped and videotaped confessions that he gave to the police were played to the jury.[2] No objection was made as to the voluntariness of these statements. The tapes were marked as exhibits and, over Robinson's objection, the circuit court allowed the jury to take these tapes into the jury room during deliberations.

On January 29, 1993, after purchasing a cellular phone, Robinson and Bowles stopped at a Diner's restaurant on the way back to their apartment. Bowles became angry at Robinson after he paid for their food even though the counter clerk forgot to charge them for it. Bowles continued to berate him as they drove home and while they ate at their apartment. She was still upset later that evening when she made several calls from work to "check up" on Robinson. A mutual friend, Michael Nadeau, confirmed that the couple was still arguing about who was right when the three of them gathered for drinks at Robinson and Bowles's apartment later that night.

After Nadeau left the apartment, Robinson admitted that he "kind of went off" at Bowles, calling her selfish and greedy. Bowles got up and went into the bedroom, while Robinson stayed in the living room and tried to cool down. He claims that there had been no physical violence as of that point. About a half an hour later, Robinson purportedly went into the bedroom and lay down next to Bowles, intending to apologize.[3] However, Bowles went into a rage and told him to leave the room. She then allegedly followed him into the living room and grabbed him around the mouth, digging her nails into his face while screaming at him.

---

1. HRS § 707–701.5(1) provides in relevant part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

2. As the tapes were being played, the jury followed along with transcripts of Robinson's confessions. These transcripts were withheld from the jury during deliberations and are not at issue in this appeal.

3. Nadeau testified that, on the morning of July 30, 1993, Robinson told him that he had awakened Bowles wanting to make love to her, but that she did not want to be bothered. Robinson admitted that they had argued before Bowles

Robinson struggled to keep calm and claims that he got up to go to the bathroom, saying to Bowles, "Just leave me alone and I won't bother you." Bowles blocked his path through the bedroom and, when he turned to walk away, punched him in the back with her fist.

At that point, Robinson claims that he "snapped." He turned around and grabbed Bowles around the throat with his left hand. His momentum caused them to fall over onto the bed, with his chest covering her face. He then "blacked out" and could not remember anything until he woke up at least a couple of hours later with his hand still around her neck. Bowles was dead. A few hours later, Robinson went downstairs to help Nadeau work on his van. Robinson later fed the cat, told several of Bowles's friends who called from work that she was not at home, asked if they had seen her, and then covered her with pillows and a sheet. Robinson then burned some incense, took four thousand dollars, and left to spend the night at the Ala Moana Hotel. The next day, he drove Bowles's car to the airport and took a commercial flight to Seattle, purportedly to speak with his daughter before killing himself. Later, without having spoken to his daughter, Robinson proceeded on to the Virgin Islands, where he eventually ran out of money. Almost three months later, Robinson was extradited and returned to Hawai'i.

In his taped confessions, Robinson admitted that he and Bowles had had arguments before, which "got a little physical." Furthermore, Nadeau's girlfriend, Susan Riccoban, testified that two or three weeks before Bowles's death, Bowles told her (in private at first and later repeating her comments to Robinson in Riccoban's presence) that she wanted to get out of the relationship because it was not working out and because Robinson did not believe that Bowles loved him.

Bowles also reportedly mentioned to Robinson, in Riccoban's presence, that both her sister and mother lived in Las Vegas and that she could make a good living there.

The jury deliberated for less than four hours before returning its verdict of guilty on the charge of second degree murder.

## II.

Robinson argues that the circuit court erred by: 1) admitting Riccoban's testimony regarding out-of-court statements made by Bowles two to three weeks prior to her death; 2) allowing the jury to have unsupervised, unlimited access to his audiotaped and videotaped confessions; and 3) failing to redact the portions of his confessions that referred to prior domestic arguments with Bowles. We address Robinson's claims as follows.

## A.

Bowles's out-of-court statements concerning her relationship with Robinson were properly admitted under the "state of mind" exception to the hearsay rule. *State v. O'Daniel*, 62 Haw. 518, 525–26, 616 P.2d 1383, 1389 (1980) (holding that the trial court properly admitted a letter written by a murder victim to a friend, which indicated that she intended to divorce the defendant, because the evidence was relevant to the determination of the defendant's motive or intent).[4] *See also* Hawai'i Rules of Evidence (HRE) Rule 803(b)(3) (1985). Because Robinson was present and heard the out-of-court statements Bowles made to himself and to Riccoban, the declaration provided relevant evidence that Robinson was aware of Bowles's future intent to leave him if their relationship did not improve. *See* Commentary on HRE Rule 803(b)(3) (1994) (citing

---

became "pissed off" and left for a friend's apartment.

4. In *State v. Renon*, 73 Haw. 23, 828 P.2d 1266 (1992), we indicated that "evidence of motive is admissible to prove the 'state of mind that prompts a person to act in a particular way; an

incentive for certain volitional activity.' [Citation omitted.] Thus, proof of motive may be relevant in tending to refute or support the presumption of innocence." *Id.* at 37, 828 P.2d at 1273.

*Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892)). Consequently, these statements are relevant to prove that, when it became apparent to him that his relationship with Bowles had not improved, Robinson had a motive to kill her rather than lose her—in other words, Robinson caused Bowles's death neither accidentally nor recklessly.

Although it is a close question whether Bowles's out-of-court statements are more probative than prejudicial, *see* HRE Rule 403 (1985),[5] we hold that the circuit court did not abuse its discretion in admitting this evidence. The evidence is clearly admissible as an exception to the hearsay rule and relevant to Robinson's possible motive for causing Bowles's death. None of the restrictions on the admissibility of relevant evidence as set forth in HRE Rule 403 favor the exclusion of Bowles's declarations.

### B.

 Robinson admitted in his videotaped confession that he and Bowles had occasionally had arguments that would "[become] a little physical." This is an admission by a party defendant that is highly probative of the issue whether the defendant acted intentionally or accidentally. *See State v. Renon,* 73 Haw. 23, 36, 828 P.2d 1266, 1272 (approving the use of prior act evidence to establish the defendant's motive or intent), *reconsideration denied,* 73 Haw. 625, 858 P.2d 734 (1992); HRE Rule 404(b) (1985).[6] "Prior bad act evidence" is admissible when it is 1) relevant and 2) more probative than prejudicial. *Cf. State v. Pinero,* 70 Haw. 509, 517–18, 778 P.2d 704, 710–11 (1989); HRE Rules 403 and 404(b), *supra* notes 5 and 6.

In *Pinero,* we held that the trial court abused its discretion in admitting testimony about a prior encounter—in which Pinero attempted to grab another officer's service revolver—to disprove Pinero's defense that he accidentally shot the officer whom he was charged with having murdered. *Id.* at 518, 778 P.2d at 711. We observed that "the trial court ... did not say why the evidence had a 'tendency to make the existence of any fact that [was] of consequence to the determination of the [case] more probable or less probable[.]'" *Id.* at 517, 778 P.2d at 710 (brackets in original). Furthermore, "[n]othing in the record even intimate[d] that [the trial court weighed the probative value of the prior bad act against the danger of unfair prejudice]." *Id.* at 518, 778 P.2d at 711.

When evidence of other [bad] acts of the defendant is offered to prove [*or disprove*] a fact of consequence in the determination of the case, the trial court must weigh a variety of factors before ruling it admissible. These include "the strength of the evidence as to the commission of the other [bad acts], the similarities between the [bad acts], the ... time that has elapsed between [the bad acts], the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility."

*Id.* (citing E.W. Cleary, *McCormack on Evidence* § 190, at 565 (3d ed. 1984); *State v. Murphy,* 59 Haw. 1, 9, 575 P.2d 448, 455 (1978)) (emphasis added). Applying this balancing test to the admitted facts in *Pinero,*[7] we held that, "on balance, [the] admission [of the evidence] constituted an abuse of discretion." *Id.*

5. HRE Rule 403 provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

6. HRE Rule 404(b) provides in pertinent part:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts ... may ... be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

7. We identified the relevant facts as follows:

What was admitted here was evidence of a *year-old* incident in which Pinero attempted to wrest a gun away from another police officer who came upon him under *somewhat similar circumstances.* Since [another officer] earlier

472

Based on our review of the record in the instant case, including the circuit court's oral rulings on the parties' respective motions in limine, the requirements of HRE Rule 404(b) have clearly been met. Thus, we hold that the circuit court properly exercised its discretion in admitting evidence of Robinson's prior bad acts.

### C.

Finally, Robinson argues that the circuit court erred in allowing the jury to have unsupervised, unlimited access to his taped confessions during its deliberations.

In *People v. Ferrero*, 874 P.2d 468 (Colo. App.1993), *cert. denied*, 874 P.2d 468 (Colo. 1994), the defendant-appellant had been convicted of first degree murder. One of the issues on appeal was whether the trial court erred in allowing the jury to review, during its deliberations, the defendant's videotaped confession, which had been admitted into evidence. The Colorado Court of Appeals ruled:

> Jurors may not have unsupervised access during deliberations to a videotape of a *witness'* out-of-court statement that was admitted into evidence in a criminal case. *People v. Montoya*, 773 P.2d 623 (Colo. App.1989). We have previously held that the same rule does not apply to evidence of a voluntary confession by the *defendant. People v. Miller*, 829 P.2d 443 (Colo.App. 1991).

In *People v. Miller*, *supra*, we determined that the *transcript* of a defendant's

testified about seeing [the victim's] service revolver in Pinero's hand, *we cannot say the need for the evidence ... was great*. But the evidence given ... was such that there was a *probability of a hostile reaction against Pinero.* 70 Haw. at 518, 778 P.2d at 711 (emphases added).

8. In *Aponte*, the Colorado Court of Appeals indicated that:

[i]t is error for a trial court to allow the jury, during deliberations, "to engage in the unsupervised, and perhaps repetitive, viewing" of a videotape of a witness' statement that was introduced into evidence as an exhibit....

confession, which has been admitted into evidence, may be taken into the jury room during deliberations so long as the defense is given an opportunity to point out any circumstances that may undermine its credibility. A confession which has been shown by the state to be free from coercive conditions is among the strongest kind of *physical* evidence the prosecution may produce. Thus, during its deliberations, the jury may have unsupervised access to the transcript of a confession. *People v. Miller, supra.*

We perceive no reason to distinguish between the *transcript* of a defendant's confession and a *videotape* of that same confession. A videotape is merely a modern substitute for a written statement; it accomplishes the same purpose, but more expeditiously and more correctly. *See State v. Triplett*, 248 Iowa 339, 79 N.W.2d 391 (1956), *cert. dismissed*, 357 U.S. 217, 78 S.Ct. 1358, 2 L.Ed.2d 1361 (1958).

We hold that a videotape of a defendant's confession, which has been admitted into evidence, may be taken into the jury room during deliberations. *See State v. Dietz*, 182 W.Va. 544, 390 S.E.2d 15 (1990), *habeas corpus granted sub nom, Dietz v. Legursky*, 188 W.Va. 526, 425 S.E.2d 202 (1992) (audiotape of defendant's confession allowed into jury room); *State v. Poulos*, 230 Kan. 512, 639 P.2d 477 (1982). *See also People v. Aponte*, 867 P.2d 183 (Colo. App.1993) (jury permitted to take into jury room videotape and transcript of drug sale)[8]; *People v. Coca*, 40 Colo.App. 440, 580 P.2d 1258 (1978) (audio tape and transcript of defendant's drug sale).

This rule is based on the premise that if testimony is available to jurors as an exhibit during their deliberations, they may give such testimony undue weight and may not accord adequate consideration to controverting testimony received from live witnesses.... Thus, videotaped "statements" of a witness are considered to be "testimonial in character," similar to depositions, to which the jurors should not have unsupervised access during deliberations....

However, ... [t]he videotape and its transcript do not constitute *statements of witnesses testimonial in character as a narrative of events.* Rather, they are tangible exhibits with verbal content which are non-testimonial in character

We therefore find no error in the trial court's decision to permit the jury to review the tape during deliberations.

*Ferrero,* 874 P.2d at 472–73 (emphasis and footnote added).

In the instant case, although Robinson's taped statements constitute "a narrative of events," *see supra* note 8, this type of physical evidence of a defendant's confession is qualitatively different from a witness' out-of-court statement or deposition. In *Miller, supra,* the Colorado Court of Appeals:

adopt[ed] the general rule, enunciated by a majority of states in which this issue has been decided, that the ... rule [that an out-of-court statement by a witness, like a deposition, admitted into evidence in a criminal case may not be taken into the jury room during the deliberations, *see People v. Montoya,* 773 P.2d 623 (Colo. App.1989) ] does not apply to a transcript of a voluntary confession by the defendant which has passed all tests of admissibility and thus has been admitted into evidence. *People v. Caldwell,* 39 Ill.2d 346, 236 N.E.2d 706 (1968), 37 A.L.R.3d 226; *see* Annot., 37 A.L.R.3d 23[8] (1971).

As was stated in *Caldwell, supra:*

"A ... confession which has been shown by the state to be free from coercive conditions is among the strongest kinds of *physical* evidence the prosecution may produce, and when the tests of admissibility have been met and the defense afforded the full opportunity to point out any circumstances which may go to undermine the credibility of the confession in the eyes of the jury, (as occurred in the present case) there appears to us no valid reason to preclude the transcript of the ... confession from going to the jury along with other exhibits which the trial judge may deem proper."

*Miller,* 829 P.2d at 446 (original brackets omitted) (emphasis added).

Whereas, the testimony of a witness is given under oath and is subject to cross-examination, a defendant's taped confession is a *"tangible exhibit[ ]* which [is] *non-testimonial* in character[.]" *Aponte,* 867 P.2d at 188 (emphases added). Once properly admitted, a "tangible exhibit" may be taken into the jury room. *Cf. State v. Pichay,* 72 Haw. 475, 477–78, 823 P.2d 152, 153 (1992) (holding that the jury's use of two dolls and a calculator, which were *not* properly admitted into evidence, was presumptively prejudicial). There would be no question in this case if, hypothetically, instead of Robinson's taped confessions, the prosecution had offered a duly authenticated letter written by Robinson to his mother admitting responsibility for Bowles's death. Clearly, such physical evidence would be allowed into the jury room during deliberations even though the letter contained Robinson's statement. *See* HRE Rules 803 and 901 (1985).

Nor, in our opinion, is there a logical reason to distinguish between a written confession and other physical evidence of a concededly damaging nature such as murder weapons, bloodstained clothing or gruesome photographs insofar as their presence in the jury room is concerned. In our judgment all should be governed by the general rule governing exhibits of physical evidence which may be taken to the jury room if the sound discretion of the trial judge dictates that they bear directly on the charge.

*Caldwell,* 39 Ill.2d at 359, 236 N.E.2d at 714.

We hereby adopt the general rule, as expressed in *Caldwell* and followed in *Ferrero,* that audiotaped and videotaped evidence of a defendant's voluntary confession, which has passed all tests of admissibility and has been duly received into evidence, may be allowed into the jury room for use by the jury during deliberations. Because Robinson's taped confessions were properly admitted into evidence as voluntary statements by the defendant, we hold that the circuit court did not

*Id.* at 188 (citations omitted) (emphasis added).

because they depict the actual commission of the crime itself.

**474**

err in permitting the jury access to the tapes on an unlimited basis.

IV.

For the foregoing reasons, we affirm the circuit court's judgment, guilty conviction, and sentence.