158 P.3d 280

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Kurtis Lee STEGER, Defendant–Appellant.**

No. 26709.

Intermediate Court of Appeals of Hawai'i.

Nov. 14, 2006.

Certiorari Rejected April 10, 2007.

Cynthia A. Kagiwada (Josette Anne Wallace, on the amended opening brief), on the briefs, for Defendant–Appellant.

Peter Hanano, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

WATANABE, Presiding Judge, NAKAMURA, and FUJISE, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Kurtis Lee Steger (Steger) appeals from the Judgment filed on June 24, 2004, in the Circuit Court of the Second Circuit (circuit court).[1] As part of his appeal, Steger challenges the circuit court's Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Dismiss For Destruction of Evidence (Order Denying Motion to Dismiss) filed on March 22, 2004. Steger was charged by indictment with numerous drug and drug paraphernalia offenses.[2] After a jury trial, Steger was

---

1. The Honorable Joel E. August presided.

2. John James Caleb Koch (Koch) was jointly charged with Defendant–Appellant Kurtis Lee Steger (Steger) in several counts of the twelve-count indictment, and they were singly charged in other counts. Koch and Steger were tried separately.

found guilty as charged of Promoting a Dangerous Drug in the First Degree (PDD1), in violation of Hawaii Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp.2001)[3] (Count 1); Prohibited Acts Relating to Drug Paraphernalia, in violation of HRS § 329–43.5(a) (1993)[4] (Counts 2, 4, 5, 6, 8); and Promoting a Dangerous Drug in the Third Degree (PDD3), in violation of HRS § 712–1243 (1993 & Supp.2001)[5] (Count 7).[6] The jury also found Steger guilty of the included offense of Attempted Promoting a Dangerous Drug in the Second Degree (Attempted PDD2), in violation of HRS § 705–500 (1993)[7] and HRS § 712–1242 (1993 & Supp. 2001)[8] (Count 3). Steger was sentenced to twenty years' imprisonment on Count 1, with a mandatory minimum term of five years; ten years' imprisonment on Count 3; five years' imprisonment on each of Counts 2, 4, 5, 6, 7, and 8, with a mandatory minimum term of 20 months on Count 7; all terms to run concurrently.

On appeal, Steger argues that the circuit court erred in: 1) refusing to dismiss the charges against Steger because the State of Hawai'i (the State) lost photographs taken during the search of his residence; 2) permitting a witness to testify about Steger's previous drug-related activities; and 3) failing to take sufficient curative action after the State's main law enforcement witness viewed a diagram that had previously been marked by other witnesses.[9] We affirm.

## BACKGROUND

In April of 2002, Steger shared a two-bedroom apartment in Kihei, Maui with John James Caleb Koch (Koch) and Bobbie Joe Cruz (Cruz). The apartment was rented in Steger's name only. Steger, Koch, and Cruz

3. During the time period charged in the indictment, Hawaii Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp.2001) provided:

(1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
(i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

4. HRS § 329–43.5 (1993) provides, in relevant part:

(a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to ... prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance.

5. During the time period charged in the indictment, HRS § 712–1243 (1993 & Supp.2001) provided, in relevant part:

(1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.

6. Prior to trial, the Circuit Court of the Second Circuit (circuit court) granted the motion of the State of Hawai'i (the State) to dismiss Count 5 of the indictment without prejudice. Counts 6 through 9 of the indictment were renumbered Counts 5 through 8 for Steger's trial. To avoid confusion, we will refer to the counts as renumbered, which is the way the counts are referred to in the jury's verdicts and in the Judgment.

7. HRS § 705–500 (1993) provides, in relevant part:

(1) A person is guilty of an attempt to commit a crime if the person:
. . . .
(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
. . . .
(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

8. During the time period charged in the indictment, HRS § 712–1242 (1993 & Supp.2001) provided, in relevant part:

(1) A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly:
. . . .
(c) Distributes any dangerous drug in any amount.

9. After the briefing was completed in this appeal, Steger's first appellate counsel moved to withdraw. The motion was granted and on May 17, 2006, a second appellate counsel was appointed. Steger's second appellate counsel also moved to withdraw. The withdrawal motion of Steger's second appellate counsel was granted and a third appellate counsel was appointed on September 8, 2006.

had previously worked together in Guam for Wallace Theaters. In April 2001, Steger transferred to Maui to work at the Maui Megaplex, where he held the position of general manager. Koch transferred to Maui in August 2001, after Steger offered Koch the position of senior manager, and Cruz transferred to Maui in February 2002, where she worked as a floor manager at the Maui Megaplex. Steger allowed Koch and Cruz to live with him in the Kihei apartment after they arrived on Maui. Steger slept in the living room while Koch and Cruz each had their own bedroom.

On April 12, 2002, shortly after 6:00 a.m., the police executed a search warrant on Steger's apartment. The warrant was obtained based on information that Koch was selling drugs from the apartment. Only Steger and Cruz were home when the warrant was executed. Maui Police Department (MPD) Officer Randy Esperanza (Officer Esperanza) was the lead investigator for the search. At trial, Officer Esperanza testified that in a black carrying case that was on futon [10] bedding on the living room floor, he found approximately four ounces of crystal methamphetamine in four plastic packets.[11] The black carrying case or bag also contained identification for Steger and almost $3,000 in cash. Pursuant to his standard procedure in conducting searches, Officer Esperanza took at least one Polaroid photo-

graph of the crystal methamphetamine and the other evidence within the black bag before he seized the evidence.

The futon bedding on the living room floor lay next to a kitchen counter which separated the living room from the kitchen. On the kitchen counter, Officer Esperanza found one hundred Ecstasy [12] tablets in a plastic bag, eleven vials of ketamine,[13] a gram scale, seventeen empty plastic packets, and Steger's cellular telephone. Officer Esperanza also recovered: 1) two glass smoking pipes along with Steger's laptop computer and wallet from the bathroom; 2) marijuana, a variety of drug paraphernalia, a Glock pistol, and magazines containing ammunition from Koch's bedroom; and 3) a police scanner, which could be heard broadcasting police transmissions, from a stand in the hallway. Another glass smoking pipe containing methamphetamine residue was recovered from Steger's pants pocket during the search incident to his arrest. No identifiable fingerprints were lifted from any of the items seized.[14]

Cruz testified that while she lived at the Kihei apartment, she saw Steger and Koch package crystal methamphetamine or "ice" into little plastic packets on almost a daily basis. Cruz saw Koch sell the ice out of the apartment and Steger sell it out of his pickup truck. Cruz stated that the four-ounce quantity of ice seized by the police was "pretty

---

10. A "futon" is "a thin mattress, usually filled with layers of cotton batting and encased in cotton fabric, placed on a floor for sleeping...." *Random House Unabridged Dictionary* (2005 Ed.), at http://dictionary.reference.com/browse/futon (last visited November 5, 2006).

11. A criminalist from the Maui Police Department testified that the substances in the four packets had an aggregate weight of 111.68 grams and that the substances in each of the four packets were analyzed and found to contain methamphetamine.

12. "Ecstasy" is "a synthetic amphetamine analog $C_{11}H_{15}NO_2$ used illicitly for its mood-enhancing and hallucinogenic properties called also MDMA, methylenedioxymethamphetamine[.]" *Merriam–Webster's Medical Dictionary* (2002 Ed.), at http://dictionary.reference.com/search?r =2 & q=Ecstasy (last visited November 5, 2006).

13. "Ketamine" is "a synthetic nonbarbiturate general anesthetic, $C_{13}H_{16}ClNO$, used to induce anesthesia, alone or in combination, in surgical

or diagnostic procedures of short duration; extensively used in veterinary medicine. *Random House Unabridged Dictionary* (2005 Ed.), at http://dictionary.reference.com/browse/ketamine (last visited November 6, 2005). It was described at trial as a horse tranquilizer.

14. The evidence recovered during the search of Steger's apartment corresponded to his counts of conviction as follows: Count 1—the approximately four ounces of methamphetamine; Count 2—the four plastic packets containing the approximately four ounces of methamphetamine; Count 3—the one hundred tablets of Ecstasy; Count 4—the plastic bag containing the Ecstasy tablets; Count 5—the eleven vials containing ketamine; Count 6—the gram scale, seventeen empty plastic packets, and two glass pipes found in the bathroom; Count 7—the methamphetamine residue from the glass pipe recovered from Steger's pocket; Count 8—the glass pipe recovered from Steger's pocket.

much present all the time" in the apartment. Cruz had smoked ice given to her by Steger and Koch. She identified the gram scale seized by the police as the one used by Steger and Koch to weigh ice and the empty plastic packets that had also been seized as resembling the ones used by Steger and Koch to package ice. Cruz observed paraphernalia for using crystal methamphetamine, such as glass pipes and bongs, in the apartment everyday and saw Steger using a glass pipe once or twice a week.

According to Cruz, Steger obtained crystal methamphetamine and sometimes Ecstasy through packages sent in the mail, which Steger picked up at the post office. Cruz recalled one occasion on which she accompanied Steger and saw him open a package he had retrieved from the post office. The package contained little baggies of ice. After opening the package, Steger immediately made a phone call and reported that he had received the package.

Cruz described her activities in the hours before the police search. Cruz and Koch worked the night shift and finished at about two or three in the morning on April 12, 2002. Koch went his own way and Cruz was dropped off at the apartment at about four or five in the morning. Upon entering the apartment, Cruz greeted Steger who pointed out the Ecstasy tablets and ketamine vials on the kitchen counter. Before that morning, Cruz had observed Steger in possession of Ecstasy and ketamine on one or two other occasions. Cruz changed her clothes and went to bed. A short time later, Steger rushed into Cruz's bedroom and yelled that "[t]he cops" were there. Cruz left her bedroom to open the door, but the police forced entry before she could do so. Cruz was arrested along with Steger. On cross-examination, Cruz acknowledged that Koch was the father of her fifteen-month-old son.

Steger testified in his own defense at trial. He admitted that he started to use ice on Guam and that he used ice "many times" in his Kihei apartment after moving to Maui. Prior to the police search, Steger had used ice in front of and with Koch and Cruz and had also used Ecstasy.

According to Steger, he learned that Koch was dealing drugs in February 2002. Steger decided to transfer to Kona and, in March 2002, informed his landlord, Koch, and Cruz that he would be leaving. Steger was supposed to start his new job as general manager of the Makalapua Cinemas in Kona on the evening of April 11, 2002. Steger testified that he went to the airport on that evening and passed through security, where his carry-on bags were searched; but he missed the last flight to Kona. He returned to the Kihei apartment a little after 1:00 a.m. on April 12, 2002. Steger noticed drugs on the kitchen counter. He had never seen those particular drugs before, although he recognized what type of drugs they were.

Steger testified that Cruz arrived home at about 5:00 a.m. and went to bed. Later, Steger heard knocking at the door and looked through the peephole. He did not open the door but went to Cruz's bedroom and told her "[t]he cops are here." Cruz ran out of the bedroom. Steger stayed in Cruz's bedroom and heard the police enter.

Steger was asked about the black bag that Officer Esperanza testified had contained approximately four ounces of crystal methamphetamine in four plastic packets, along with Steger's identification and about $3,000 in cash. Steger testified that he had placed his identification and cash in the bag prior to taking the bag to the airport. Steger denied, however, that four packets of crystal methamphetamine had been in the bag before the police arrived. Steger testified that he did not have any intent to take the crystal methamphetamine to Kona or to distribute or possess the drugs found in his apartment. He admitted to owning the methamphetamine pipe that was taken from his pocket during the search incident to his arrest.

## DISCUSSION

### I.

### A.

Prior to his trial, Steger obtained transcripts of Officer Esperanza's testimony at the trial of co-defendant Koch. During Koch's trial, Officer Esperanza testified that he re-

covered four ounce-sized packets of methamphetamine, along with Steger's passport, driver's license, and $2,850 in cash, from a black handbag that was on bedding on the living room floor. Officer Esperanza also described his practice of photographing evidence prior to recovering it. He disclosed, however, that the photographs he had taken during the search of Steger's residence had been lost.

Steger filed a motion to dismiss the indictment based on the "destruction" of the photographs taken during the search. In support of the motion, Steger alleged that "[t]he photographs, if preserved, would show that the drugs were either on the kitchen counter or the floor of the apartment, but not in [Steger's] bag." Steger further contended that without the photographs, he had no way of rebutting Officer Esperanza's testimony that the methamphetamine was found in Steger's bag.

At the hearing on Steger's motion to dismiss, Officer Esperanza stated that he took numerous Polaroid photographs during the search of Steger's residence. At least one of the photographs showed the methamphetamine within the black bag. Officer Esperanza testified that the normal practice was to attach a manila envelope containing the all the photographs taken during a search to the police report. The police report with the attached photographs would then be placed in a bin for delivery to the prosecutor's office. Officer Esperanza had prepared the police report in Steger' case and was sure that he had attached the photographs to the report sent to the prosecutor's office. The photographs were apparently lost somewhere between being placed in the bin and being delivered to the prosecutor's office.

The circuit court denied Steger's motion to dismiss. In its written Order Denying Motion to Dismiss, the court concluded, among other things, that the photographs "were not destroyed in bad faith simply because their whereabouts are unknown;" that Steger had not shown that the photographs were exculpatory in nature; and that Steger had not met the standard for showing a due process violation.

**B.**

On appeal, Steger argues that the loss of the photographs, which he contends constituted key evidence of the location of the four packets of crystal methamphetamine, violated his due process right to a fair trial. He therefore claims that the circuit court erred in denying his motion to dismiss the indictment.

In *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the United States Supreme Court addressed the due process implications of the prosecution's failure to preserve potentially exculpatory evidence. In *Youngblood,* the police failed to properly preserve semen stains on the clothing of a sexual assault victim or expeditiously perform tests on a rectal swab taken from the victim. *Id.* at 53–54, 109 S.Ct. 333. The defendant's principal defense at trial was that he was not the perpetrator and that the victim had erred in identifying him. *Id.* at 54, 109 S.Ct. 333. If the semen samples had been properly preserved and timely tested, the tests "could have produced results that might have completely exonerated [the defendant]." *Id.* at 55, 109 S.Ct. 333.

The United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute the denial of due process of law." *Id.* at 58, 109 S.Ct. 333. Because the failure of the police to preserve the semen stains on the victim's clothing and to perform tests on the semen samples was "at worst" negligent and there was no suggestion of bad faith on the part of the police, the Court concluded that there was no due process violation. *Id.* at 58, 109 S.Ct. 333.

The Court acknowledged that under its due process analysis in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the good or bad faith of the prosecution is irrelevant when the prosecution fails to disclose material exculpatory evidence to the defense. *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333. The Court, however, determined that a different result under the Due Process Clause is appropriate where the prosecution fails to preserve evidence that is only poten-

tially exculpatory. *Id.* The Court provided two justifications for requiring the defense to show bad faith on the part of the police in this situation. First, the Court noted that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id.* at 57–58, 109 S.Ct. 333 (quoting *California v. Trombetta,* 467 U.S. 479, 486, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). Second, the Court stated that it was unwilling to read the "fundamental fairness" requirement of the Due Process Clause as imposing an absolute duty on the police to preserve all material that might be of conceivable evidentiary significance in a prosecution. *Id.* at 58, 109 S.Ct. 333. The Court concluded:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.*

In a concurring opinion, Justice Stevens agreed with the result reached by the majority, but did not join in the majority's opinion. *Id.* at 60, 109 S.Ct. 333. In particular, Justice Stevens disagreed with the majority's decision to make the showing of bad faith a necessary condition for establishing a due process violation where potentially exculpatory evidence was lost or destroyed. *Id.* at 60–61, 109 S.Ct. 333. Justice Stevens stated:

> In my opinion, there may well be cases in which the defendant is unable to prove that the [prosecution] acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.

*Id.* at 61, 109 S.Ct. 333. Justice Stevens concluded that "[t]his, however, is not such a case." *Id.* Among other things, Justice Stevens found it significant that the trial judge had instructed the jury that it was permitted to infer that any evidence lost or destroyed by the prosecution would have been adverse to the prosecution's interest. *Id.* at 59–60, 109 S.Ct. 333. According to Justice Stevens, this permissive inference instruction made it unlikely that the defendant was prejudiced by the prosecution's failure to preserve the evidence. *Id.* at 59, 109 S.Ct. 333. The instruction turned the uncertainty over what the evidence might have shown to the defendant's advantage. *Id.* at 60, 109 S.Ct. 333.

In *State v. Matafeo,* 71 Haw. 183, 787 P.2d 671 (1990), the Hawai'i Supreme Court adopted Justice Steven's formulation for determining whether the loss or destruction of potentially exculpatory evidence violated due process under the Hawai'i Constitution. *Id.* at 187, 787 P.2d at 673. Defendant Matafeo was charged with sexual assault and kidnapping. *Id.* at 184, 787 P.2d 671–72. The police inadvertently destroyed the complainant's clothing, including a pair of panties described as having a ripped crotch. *Id.* at 183–84, 787 P.2d at 671–72. Matafeo filed an interlocutory appeal of the trial court's order denying his motion to dismiss the complaint. *Id.* at 183, 787 P.2d at 671. On appeal, Matafeo argued that the destruction of the complainant's clothing violated his right to due process because the clothing would have corroborated his defense that the complainant consented to the sexual intercourse. *Id.* at 185, 787 P.2d at 672.

In announcing the test for evaluating Matafeo's due process claim under the Hawai'i Constitution, the Hawai'i Supreme Court stated:

> We cannot agree that we need go no further than *Arizona v. Youngblood* to determine if Appellant has been denied due process. We believe the strict reading of the due process principles in *Arizona v. Youngblood* would preclude us, in cases where no bad faith is shown, from inquiring into the favorableness of the evidence or the prejudice suffered by the defendant as a result of its loss. This court has held that "the duty of disclosure is operative as a duty of preservation," [and] that principle must be applied on a case-by-case basis."

*Id.* at 187, 787 P.2d at 673 (citations and some quotation marks omitted; brackets in original). The court then opted for the test set forth by Justice Stevens in his concurring opinion in *Youngblood.* The Hawai'i Supreme Court stated:

> In certain circumstances, regardless of good or bad faith, the State may lose or destroy material evidence which is "so critical to the defense as to make a criminal trial fundamentally unfair" without it.

*Id.* at 187, 787 P.2d at 673 (quoting, *Youngblood,* 488 U.S. at 61, 109 S.Ct. 333 (Stevens, J., concurring)). Applying this test, the court concluded that due process did not require dismissal of the complaint against Matafeo because "the complainant's clothing is not evidence so crucial to the defense that its destruction will necessarily result in a fundamentally unfair trial." *Id.* at 187, 787 P.2d at 673.

Justice Wakatsuki, concurring specially, agreed that the destruction of the complainant's clothing did not necessitate the dismissal of the complaint. *Id.* at 189, 787 P.2d at 674. However, he would have remanded the case with a directive that Matafeo was entitled, upon request, to an instruction advising the jury that it may infer that the destroyed evidence would have been favorable to the defense and against the prosecution. *Id.* Justice Wakatsuki believed that such an instruction could adequately protect Matafeo's due process rights as well as give the police an incentive to improve their procedures and practices in preserving evidence. *Id.*

## C.

■ Steger does not dispute that the photographs were lost inadvertently. Nor does he challenge the circuit court's conclusion that there was no bad faith on the part of the State. Steger argues that the lost photographs were potentially exculpatory because they may have shown that the packets con-

taining approximately four ounces of crystal methamphetamine were not in his bag. Steger contends that the loss or destruction of the potentially exculpatory evidence automatically violated his due process rights and required the dismissal of his charges.[15] We disagree.

Steger's contention that criminal charges should automatically be dismissed whenever potentially exculpatory evidence is lost or destroyed is incompatible with the test set forth by the Hawai'i Supreme Court in *Matafeo.* Evidence that is lost or destroyed is by definition unavailable and, accordingly, its true exculpatory value is often impossible to determine. Because the true contents of lost or destroyed evidence generally cannot be verified, such evidence is easily converted into potentially exculpatory evidence by a defendant's assertion that he or she is innocent and that the lost or destroyed evidence would help corroborate his or her defense. Thus, a rule of automatic dismissal whenever potentially exculpatory evidence is lost or destroyed would require dismissal in virtually every case in which evidence is inadvertently lost or destroyed and the defendant asserts his or her innocence.

■ In deciding to go beyond the majority's decision in *Youngblood,* the Hawai'i Supreme Court did not rule that the loss or destruction of potentially exculpatory evidence automatically requires dismissal of the charges on due process grounds. The court simply held that further inquiry would not be *precluded* in cases where no bad faith on the part of the prosecution was shown. *Matafeo,* 71 Haw. at 187, 787 P.2d at 673. The court permitted inquiry into the impact that the loss of potentially exculpatory evidence had on a defendant's right to a fair trial on a case-by-case basis. *Id.* The test adopted by the Hawai'i Supreme Court does not require automatic dismissal whenever potentially exculpatory evidence is lost or destroyed.

---

15. Although Steger argues for the dismissal of "the charges" against him, we fail to see how his claims regarding the lost photographs affect the validity of his convictions on Counts 7 and 8, which were based on the glass pipe containing methamphetamine residue that was recovered from his pants pocket. Steger admitted at trial that the police had taken a methamphetamine

pipe, which belonged to him, from his pocket. Indeed, Steger's arguments regarding the lost photographs focus solely on where the four packets of crystal methamphetamine were found, which is only relevant to Counts 1 and 2. Steger does not appear to dispute the location of the other drugs and drug paraphernalia found in the apartment.

Rather, it authorizes dismissal in certain circumstances, regardless of good or bad faith, where the evidence lost or destroyed is "so critical to the defense as to make a criminal trial fundamentally unfair without it." *Id.* (internal quotation marks omitted).[16]

Applying the *Matafeo* standard to Steger's case, we conclude that the loss of the photographs did not violate Steger's due process rights. First, we note that the lost photographs, even if they failed to depict any packets of crystal methamphetamine within Steger's bag, would not have exculpated Steger. The alternatives suggested by Steger in his motion to dismiss—that the packets of methamphetamine were found on the living room floor (where Steger slept) or on the kitchen counter (where his cell phone was found)—would still have left the State with sufficient evidence to show that Steger knowingly possessed the methamphetamine. The lost photographs (if they corroborated Steger's testimony) could only have diminished the strength of the State's evidence; they could not have provided Steger with a complete defense. Accordingly, the potential exculpatory value of the lost photographs was not compelling.

The police search revealed that there were drugs and drug paraphernalia scattered throughout the apartment and an operating police scanner in the hallway. Cruz, Steger's roommate, testified that Steger had been actively involved in selling and using crystal methamphetamine. Under the circumstances, it is doubtful that photographs showing that there were no packets of methamphetamine in Steger's bag would have affected the outcome of the case. Indeed, in convicting Steger of Attempted PDD2, the jury found that Steger was responsible for the Ecstasy tablets that were recovered from the kitchen counter.

Second, Steger's claim that the lost photographs may have been favorable to him was speculative. Steger had never seen the photographs. Officer Esperanza, the person who took the photographs, asserted that at least one of the photographs would have shown that the crystal methamphetamine was in Steger's bag. Officer Esperanza's assertion was partially corroborated by the narcotics dog handler, who testified that he did not recall seeing any drugs on the floor when the dog alerted to the scent of narcotics by the makeshift futon bed on the living room floor. In addition, Steger testified that Cruz ran out of her bedroom when he told Cruz the police were outside the apartment. According to Steger, he remained inside the bedroom and thus did not know what Cruz had done between the time she ran out of the bedroom and the police forced entry into the apartment. Steger suggested that during this time, Cruz may have placed the crystal methamphetamine in his bag as a means of shifting the blame away from herself and Koch.[17] Under this scenario, the photographs would have shown that the packets of crystal methamphetamine were in Steger's bag, even if Steger had not placed them there.

Third, the loss of the photographs did not preclude Steger from pursuing his line of defense, which was that he did not knowingly possess the crystal methamphetamine. *See Matafeo*, 71 Haw. at 188, 787 P.2d at 674. Steger testified that he had not placed the crystal methamphetamine in his bag. To bolster this claim, he testified that he had taken the bag through airport security the night before and had only returned to

---

16. In its March 22, 2004, Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Dismiss For Destruction of Evidence, the circuit court included the following as its Conclusion of Law (COL) Number 6:

6. If potentially exculpatory evidence is destroyed, Defendant's due process rights are violated regardless of the government's lack of bad faith.

We disagree with COL Number 6 to the extent that it suggests that the dismissal of the charges is automatically required whenever potentially exculpatory evidence is lost or destroyed. The circuit court cited *State v. Okumura*, 78 Hawai'i

383, 894 P.2d 80 (1995), as support for COL Number 6. *Okumura*, however, only applied the test set forth in *State v. Matafeo*, 71 Haw. 183, 187, 787 P.2d 671, 673 (1990). *Okumura* did not change the *Matafeo* test. *Okumura*, 78 Hawai'i at 402, 894 P.2d at 99.

17. In closing argument, Steger's counsel stated:

[Bobbie Joe Cruz] knows if she can get drugs close to where [Steger's] stuff is supposed to be, whether she throws it there or whether she actually places it there, we don't know. We weren't there. We can't prove it.

the apartment because he missed his flight. Steger was also able to impeach Officer Esperanza's testimony that Officer Esperanza found the crystal methamphetamine in Steger's bag. Steger pointed out that Esperanza's police report only stated that the crystal methamphetamine was found in the living room area, and not that the crystal methamphetamine was found in Steger's bag. Steger also elicited testimony from Officer Maeda, who assisted Officer Esperanza in recovering the evidence, that Officer Maeda could not be sure whether the crystal methamphetamine was found in the bag or on the living room floor next to the bag.

Finally, the circuit court gave the jury an instruction that permitted the jury to infer that the lost photographs "would be evidence favorable to the defense." [18] In *Youngblood,* Justice Stevens cited such an instruction in concluding that it was unlikely that the defendant was prejudiced by the lost evidence. *Youngblood,* 488 U.S. at 59–60, 109 S.Ct. 333. In *Matafeo,* Justice Wakatsuki advocated giving such an instruction as a means of assuring that the defendant's due process rights would be adequately protected. *Matafeo,* 71 Haw. at 189, 787 P.2d at 674. Here, the circuit court's instruction eliminated any substantial prejudice flowing from the loss of the photographs by permitting Steger to use the uncertainty over what the photographs might have shown to his advantage. *See Youngblood,* 488 U.S at 60, 109 S.Ct. 333. The instruction provided adequate protection for Steger's due process rights. *Matafeo,* 71 Haw. at 189, 787 P.2d at 674.

Under the circumstances of Steger's case, we hold that the lost photographs were not evidence "so critical to the defense as to make [Steger's] criminal trial fundamentally unfair without [the evidence]." *Matafeo,* 71 Haw. at 187, 787 P.2d at 673 (internal quotation marks omitted). Steger was not denied his due process rights to a fair trial.

**18.** The circuit court's instruction stated as follows:

> You may infer, but are not required to infer that the lost photographs which were in the custody and control of the State when they were lost would be evidence favorable to the defense.

## II.

### A.

At trial, Cruz was permitted to testify about her observation of Steger's drug-related activities during the two-month period preceding the execution of the search warrant, when she lived with Steger in the Kihei apartment. Among other things, Cruz testified that during this time period, she saw Steger package crystal methamphetamine into plastic packets and sell crystal methamphetamine out of his truck. She also saw quantities of crystal methamphetamine in the apartment that were consistent with the approximately four ounces seized by the police. Cruz testified that Steger obtained crystal methamphetamine and Ecstasy through packages sent in the mail. She recounted one incident in which Steger, in her presence, opened a package he had just picked up from the post office. The package contained baggies of crystal methamphetamine. Cruz further testified that Steger made bongs, used crystal methamphetamine and Ecstasy in her presence, and gave her illegal drugs to use.

### B.

On appeal, Steger contends that the circuit court erred in permitting Cruz's testimony about his drug-related activities on Maui because this testimony was irrelevant and unduly prejudicial.[19] We disagree.

Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp.2005) provides in relevant part that:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the

**19.** The circuit court granted the portion of Steger's motion *in limine* which precluded Bobbie Joe Cruz (Cruz) from testifying about Steger's drug activities on Guam. Steger had a 2003 Guam conviction for drug importation. He was extradited from Guam, where he was incarcerated, to stand trial in Hawai'i.

determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Under HRE Rule 404(b), "other bad act" evidence is admissible when: 1) it is relevant to any fact of consequence other than the defendant's propensity to commit the crime charged; and 2) its probative value is not substantially outweighed by the danger of unfair prejudice. *State v. Renon*, 73 Haw. 23, 31–32, 828 P.2d 1266, 1270 (1992). A trial court's determination that evidence is relevant turns on the application of HRE Rule 401 (1993) [20] and is reviewed under the right/wrong standard. *State v. Cordeiro*, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002). The trial court's decision in balancing probative value against unfair prejudice involves the application of HRE Rule 403 (1993) [21] and is reviewed for abuse of discretion. *Cordeiro*, 99 Hawai'i at 404, 56 P.3d at 706. A trial court does not abuse its discretion unless it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Matias*, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (internal quotation marks and brackets omitted).

■ In ruling on whether to admit evidence under HRE Rule 404(b), the trial court must consider a variety of factors. *State v. Robinson*, 79 Hawai'i 468, 471, 903 P.2d 1289, 1292 (1995). These include:

> the strength of the evidence as to the commission of the other bad acts, the similarities between the [other] bad acts [and the charged crime], the time that has elapsed between the [other] bad acts [and the charged crime], the need for the evidence, the efficacy of alternate proof, and the degree to which the evidence will prob-

ably rouse the jury to overmastering hostility.

*Id.* (quoting *State v. Pinero*, 70 Haw. 509, 518, 778 P.2d 704, 711 (1989)) (ellipses, brackets, and quotation marks omitted).

## C.

■ Cruz's testimony regarding Steger's drug-related activities on Maui was directly relevant to proving Steger's knowledge and intent with respect to the drugs found in the apartment. The State was required to prove that Steger knowingly possessed at least one ounce of methamphetamine to establish the PDDI offense charged in Count 1. It was required to prove that Steger intended to distribute at least 25 tablets of Ecstasy to establish the Attempted PDDI offense charged in Count 3.[22] Cruz's testimony that during the two months preceding the search, Steger was actively involved in acquiring, packaging, and selling methamphetamine and had possessed Ecstasy was obviously probative of whether Steger had the requisite criminal intent. *United States v. Foster*, 344 F.3d 799, 801–02 (8th Cir.2003) (holding that evidence of the defendant's prior drug dealing was relevant and admissible to prove his knowledge of and intent to distribute drugs); *see State v. Kealoha*, 95 Hawai'i 365, 380, 22 P.3d 1012, 1027 (App.2000) (concluding that evidence of the defendant's prior sale of methamphetamine was relevant and admissible to show her motive to manufacture methamphetamine and her intent to do so); *Cordeiro*, 99 Hawai'i at 416, 56 P.3d at 718 (concluding that evidence that the defendant had previously trafficked in one type of drug may be relevant to whether he was involved in trafficking in other drugs). Cruz's testimony went to a critical aspect of the State's required proof.

---

20. Hawaii Rules of Evidence (HRE) Rule 401 (1993) provides:

> **Definition of "relevant evidence".** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

21. HRE Rule 403 (1993) provides:

> **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Al-

though relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

22. As previously noted, the jury found Steger guilty of the included offense of Attempted Promoting a Dangerous Drug in the Second Degree (Attempted PDD2) on Count 3.

■ The probative value of Steger's contemporaneous drug-related activities was heightened by Steger's defense, which basically was that he was merely present in the apartment and did not knowingly possess the approximately four ounces of crystal methamphetamine or intend to distribute the Ecstacy tablets recovered by the police. Steger attempted to place the blame for the methamphetamine and the Ecstasy found in the apartment solely on his co-defendant, Koch. Evidence of Steger's recent drug activities served to refute his defense that he was merely present in the apartment and had no responsibility for the methamphetamine and Ecstasy that were found there. *See State v. Austin,* 70 Haw. 300, 307, 769 P.2d 1098, 1102 (1989) (holding that evidence of the defendant's prior drug dealing was admissible under HRE Rule 404(b) where the defendant denied any involvement in the cocaine trafficking at issue); *Foster,* 344 F.3d at 801–02 (concluding that the defendant's defense, which closely resembled a "mere presence" defense, placed his state of mind into question and supported the admission of his prior drug trafficking conviction to prove his knowledge and intent regarding the charged drug offense).

Other factors support the circuit court's admission of Cruz's testimony under HRE Rule 404(b). Cruz had intimate and direct knowledge of Steger's drug activities on Maui. Steger's other drug activities were very similar and close in time to the charged drug offenses. There was a substantial need for Cruz's testimony regarding Steger's drug activities because the other evidence of Steger's knowledge and intent was circumstantial and because Steger had denied any criminal knowledge or intent.

Finally, the evidence of Steger's other drug activities was not likely to "rouse the jury to overmastering hostility." *State v. Robinson,* 79 Hawai'i at 471, 903 P.2d at 1292. Indeed, Steger himself injected his prior involvement with drugs into the trial by characterizing himself as a heavy methamphetamine user. Steger employed this strategy to explain how he could be present in an apartment filled with drugs and yet not be responsible for the distribution quantities of crystal methamphetamine and Ecstasy found in the apartment. Steger's trial strategy significantly diminished the risk that any unfair prejudice resulted from Cruz's testimony regarding Steger's other drug activities.

We conclude that the probative value of Cruz's testimony regarding Steger's other drug activities was not substantially outweighed by the danger of unfair prejudice. The circuit court did not abuse its discretion in permitting Cruz's testimony.

### III.

#### A.

During the testimony of MPD Lieutenant Gregory Moniz (Lieutenant Moniz), the Deputy Prosecuting Attorney (DPA) introduced a diagram of Steger's apartment. The diagram was admitted as Exhibit S–22. Lieutenant Moniz was the head of the team that made the forced entry into the apartment to execute the search warrant. The DPA had Lieutenant Moniz mark on Exhibit S–22 where Cruz was located after the police entered the apartment.

Without objection from Steger, the DPA used Exhibit S–22 during Cruz's testimony. The DPA had Cruz mark on Exhibit S–22 where various things in the apartment were situated, such as Cruz's bedroom, Koch's bedroom, and Steger's bed. The only marks on Exhibit S–22 made by Cruz that related to evidence recovered during the search were marks showing the location of the Ecstasy tablets, the ketamine, and the police scanner. Cruz used "X"s to show the location of the Ecstasy and ketamine and identified the location of the police scanner by drawing a rectangle, which she labeled "radio scanner."

After Officer Esperanza started his testimony, Steger's counsel requested that the DPA be precluded from using Exhibit S–22 in connection with her examination of Officer Esperanza. Steger's counsel argued that the prior markings on the diagram by Lieutenant Moniz and Cruz could influence Officer Esperanza's testimony. The DPA responded that the prior markings were not self-explanatory and thus would not unduly influence Officer Esperanza. The circuit court instructed the DPA to use a clean diagram in

questioning Officer Esperanza. The court granted a recess so that the DPA could obtain a clean diagram. It does not appear that Officer Esperanza was privy to the discussion between the circuit court and counsel.

When the recess was over, but before Officer Esperanza resumed testifying, Steger's counsel complained at a bench conference that during the recess, Exhibit S–22 had remained on the wall and that Officer Esperanza had "studied it for a good minute and a half." The DPA responded that she wasn't paying attention to what Officer Esperanza had been doing. The court ordered that Exhibit S–22 be taken down and advised Steger's counsel that he could cross-examine Officer Esperanza about his viewing of the marked diagram. Steger did not move for a mistrial.

During the DPA's resumed direct examination, Officer Esperanza used a clean diagram to mark the location of the items he had recovered during the search of the residence. The DPA then offered this diagram into evidence as Exhibit S–33. Before ruling on the admissibility of Exhibit S–33, the circuit court permitted Steger's counsel, in the jury's presence, to question Officer Esperanza about his viewing of the previously-marked Exhibit S–22. Officer Esperanza testified that he had looked at Exhibit S–22 for thirty seconds to a minute. He saw some markings on the diagram but was not sure who had placed them there. He did not talk to the DPA about the markings on Exhibit S–22. Officer Esperanza testified that the markings on Exhibit S–22 had not influenced his testimony in any way. The circuit court admitted Exhibit S–33 over Steger's objection.

### B.

On appeal, Steger contends that permitting Officer Esperanza to view a diagram that had previously been marked by other witnesses violated the circuit court's witness sequestration order issued pursuant to HRE Rule 615 (1993). Steger argues that the circuit court erred by failing to take sufficient curative action in response to Officer Esperanza's violation of the HRE Rule 615

sequestration order. He asserts that the circuit court, at the very least, should have prohibited Officer Esperanza from testifying about the location of the items that he recovered from the apartment. Steger's arguments are devoid of merit.

Prior to trial, the circuit court imposed a witness sequestration order in response to Steger's request. HRE Rule 615 provides, in relevant part:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

In *State v. Elmaleh*, 7 Haw.App. 488, 782 P.2d 886 (1989), this court stated that "[t]he purpose of HRE Rule 615 is 'to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion.' " *Id.* at 492, 782 P.2d at 889 (quoting, *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir.1981)). This court further concluded that although the explicit language of HRE Rule 615 only requires an order excluding prospective witnesses from the courtroom, the circumvention of the rule should not be permitted by indirect means. *Elmaleh*, 7 Haw.App. at 492, 782 P.2d at 889.

HRE Rule 615 is silent on the appropriate penalty a court should impose for violation of a sequestration order. *Id.* at 493, 782 P.2d at 889. The Hawai'i Supreme Court has ruled that "the sanctions which a court chooses to attach to the violation of its [sequestration] order is a matter within the discretion of that court." *Harkins v. Ikeda*, 57 Haw. 378, 384, 557 P.2d 788 (1976). As a general rule, noncompliance with an HRE Rule 615 sequestration order does not require a new trial "unless the court's decision to allow the allegedly tainted testimony was an abuse of discretion or resulted in prejudice to the defendant." *Elmaleh*, 7 Haw. App. at 493, 782 P.2d at 890 (quotation marks omitted). The defendant bears the burden of proving prejudice or an abuse of discretion. *Id.* at 494, 782 P.2d at 890.

Assuming, without deciding, that Officer Esperanza's viewing of the previously-

marked Exhibit S–22 violated the circuit court's sequestration order, the violation was harmless beyond a reasonable doubt. Officer Esperanza was the officer responsible for recovering the evidence seized during the search and documenting where the evidence was located. He had prepared a written inventory of the items seized and their location as part of the search warrant return filed with the court that issued the warrant. His knowledge of the location of the evidence seized was superior to that of the other witnesses. He had no reason to be influenced by or to rely on markings concerning the location of the evidence made by other witnesses on Exhibit S–22.

The previously-marked Exhibit S–22 only had two markings pertaining to the evidence seized. Cruz marked the location of the Ecstasy and ketamine with "X"s and used the words "radio scanner" in identifying the location of the police scanner. There was no explanation of what the "X"s represented. Indeed, Officer Esperanza testified that he did not recall seeing any "X"s when he looked at Exhibit S–22. Our review of Exhibit S–22 convinces us that Officer Esperanza's viewing of that diagram did not result in any prejudice to Steger. That conclusion is reinforced by the failure of Steger's counsel to move for a mistrial based on Officer Esperanza's viewing of the previously-marked Exhibit S–22.

Finally, the circuit court took sufficient remedial action by permitting Steger to cross-examine Officer Esperanza about his viewing of Exhibit S–22. *See Elmaleh*, 7 Haw.App. at 494, 782 P.2d at 890. This not only alerted the jury to what had happened but also permitted Steger to attack Officer Esperanza's credibility by arguing that Officer Esperanza had been influenced by his exposure to the previously-marked diagram. Both Exhibit S–22 and the clean diagram marked by Officer Esperanza (Exhibit S–33) were admitted in evidence. Accordingly, the jury was able to judge for itself the extent to which Officer Esperanza's testimony may have been improperly influenced by his viewing of Exhibit S–22. Under the circumstances, we conclude that the circuit court did not abuse its discretion in responding to the alleged violation of the HRE Rule 615 sequestration order.

## CONCLUSION

The circuit court's June 24, 2004, Judgment is affirmed. With respect to the circuit court's March 22, 2004, Findings of Fact, Conclusions of Law, and Order Denying Defendant's Motion to Dismiss For Destruction of Evidence, we affirm the circuit court's decision to deny Steger's Motion to Dismiss for Destruction of Evidence, its findings of fact, and those conclusions of law that are not inconsistent with this opinion.

