LAW LIBRARY

**FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
DENNIS BROOKS, Defendant-Appellant

NO. 29567

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 06-1-1104)

JULY 22, 2010

FOLEY, PRESIDING J., FUJISE AND LEONARD, JJ.

OPINION OF THE COURT BY FOLEY, J.

Defendant-Appellant Dennis Brooks (Dennis) appeals from the Judgment of Conviction and Sentence (Judgment) filed on December 9, 2008 in the Circuit Court of the First Circuit (circuit court).[1]

A jury found Dennis guilty of Kidnapping, in violation of Hawaii Revised Statutes (HRS) § 707-720 (1993) (Count 6); Robbery in the First Degree, in violation of HRS § 708-840 (Supp. 2005) (Count 7); and Unauthorized Control of Propelled Vehicle (UCPV), in violation of HRS § 708-836 (Supp. 2009) (Count 8). The circuit court sentenced Dennis to twenty years of imprisonment for each of Counts 6 and 7 and five years of imprisonment for Count 8, with credit for time served. The circuit court ordered the sentence for Count 6 to run consecutively to the sentence for Count 7 and the sentence for Count 8 to run concurrently with the sentences for Counts 6 and 7. Because Dennis was a repeat offender, the circuit court sentenced him to a mandatory minimum of six years and eight

---

[1] The Honorable Steven S. Alm presided.

months of imprisonment on Counts 6 and 7 and one year and eight months of imprisonment on Count 8. The circuit court also ordered Dennis to pay restitution and a crime victim compensation fee.

On appeal, Dennis argues that the circuit court

(1) abused its discretion in allowing the State of Hawai'i (State) to adduce at trial evidence of his prior convictions;

(2) erred in failing to instruct the jury on the included offenses of Robbery in the Second Degree and Theft in the Fourth Degree;

(3) erred in convicting him of Robbery in the First Degree based on insubstantial evidence; and

(4) erred in convicting him of Class A, rather than Class B, Kidnapping because he had released the victim, Tuan Vo (Vo), in a safe place.

Dennis asks that we vacate his convictions and remand his case for a new trial if we agree with his first argument or, alternatively, vacate his convictions for Robbery in the First Degree and Kidnapping if we agree with his second argument, reverse his conviction for Robbery in the First Degree if we agree with his third argument, and/or reverse his conviction for Kidnapping if we agree with his fourth argument.

I.

A.   PRETRIAL

1.   Complaint

The State filed a complaint on May 30, 2006, asserting that William Brooks (William), Dennis, and Barbara Pichay (Barbara) had committed various offenses involving Vo. The State alleged that on April 16, 2006, Dennis (a) intentionally or knowingly restrained Vo with the intent to facilitate the commission of Robbery in the First Degree or flight thereafter (Count 6, Kidnapping); (b) used force against Vo in the course of committing a theft while armed with a dangerous instrument, with the intent to overcome Vo's physical resistance or physical power of resistance (Count 7, Robbery in the First Degree); and (c)

2

intentionally or knowingly exerted unauthorized control over a propelled vehicle by operating Vo's vehicle without Vo's consent (Count 8, UCPV).

### 2. Pretrial Hearing

At the May 22, 2008 pretrial hearing, the circuit court stated the following to Dennis:

> THE COURT: Okay. The other thing is that based on certain rulings that we have, those are the ground rules at the start. So say, for example, the fact that, you know, you have certain other conviction [sic] for things. I'm anticipating that both sides are going to be agreeing that that is not admissible, not appropriate to come into the trial.
>
> But if you were to get on the stand and testify and say something like I've never been in trouble with the police before, no doubt the prosecutor -- I'm not saying you'd do that, I'm just telling you if you did that the prosecutor would say, Your Honor, may we approach, and he would come up here and he would say I think [Dennis] might be giving an inappropriate picture of himself to the jurors. And so he then would ask permission to bring in your prior record which, in a situation like that, I should allow it. So that's called opening the door, right, that's the legal expression.

The State agreed that it would not introduce any of Dennis's prior bad acts or criminal history in the State's case-in-chief. However, the State informed the circuit court that in the event Dennis's counsel opened the door to such evidence, the State would ask the court to rule on the evidence's admissibility.

### B. JURY TRIAL

#### 1. Vo's Testimony

Vo testified that he was a taxi driver. On April 16, 2006, he left for work, carrying about $450 cash in his wallet, $400 cash in his pocket, and 3,000 yen. He had his driver's license and bank cards in his wallet. He was wearing a Rado watch and a white gold necklace and had a cell phone with him. He had between $10 and $12 in change in the ashtray in his taxi.

At about 8:30 a.m., Vo picked up William and Barbara near Lanakila Park. William and Barbara asked him to take them to the Chinatown/downtown area to look for a friend. Vo recalled that William sat in the front passenger seat and Barbara probably sat in the center row behind the passenger seat. Vo drove downtown, but William and Barbara could not find the person they

were looking for. They asked Vo to drive them to Waianae, but Vo declined to do so. William and Barbara then asked Vo to take them to Ala Moana. On their way to Ala Moana, William and Barbara saw Dennis walking on the sidewalk, and they told Vo to pull over and pick him up. Vo pulled up to the curb alongside Dennis, and Barbara got out. Barbara walked with Dennis, talking to him. Vo drove slowly alongside Barbara and Dennis for about two minutes before they got into the van. When William and Dennis saw each other, they bumped their fists together, called each other "brothers," and apologized to each other about something.

William, Dennis, and Barbara (collectively, the passengers) told Vo they wanted to go to Barbara's aunt's house behind the Lanakila Health Center. When they arrived, Vo parked and the passengers got out of the van. Barbara looked for money to pay Vo, but could not find any. The passengers got back into the van, and Barbara asked Vo to drive to an ATM. Dennis was now seated in the front passenger seat and William was in the center row, behind the driver's seat. Vo drove to the Liliha Foodland. Barbara got out of the van, while William and Dennis remained seated. When Barbara returned to the van, the passengers told Vo to take them back to the Lanakila area and said they would pay Vo there.

When they arrived at their destination, Vo put the van in park. As soon as Vo shifted into park, William put his left arm around Vo's neck and pulled Vo back against Vo's seat. William first put a knife about five-to-five-and-a-half-inches long to Vo's side, and then William put the knife to the right side of Vo's neck. Dennis held down Vo's hands. William and Dennis asked Vo where his money was. Either William or Barbara took Vo's wallet, and Dennis took the $10 or $12 in change Vo had in the ashtray in the center console of the van. William and Dennis took Vo's driver's license out of his wallet and told Vo that if he reported the incident to the police, his family would be killed. Vo testified that both men made the threat and

Dennis, more than once. Vo was married and had two daughters. He was afraid and felt he had to do what they said.

Vo was told to put the van in reverse, but he was too shaky. William pulled and Dennis pushed Vo back into the center seat in the second row, between William and Barbara. Dennis got into the driver's seat. Vo saw the knife in the console and then saw William holding the knife.

Dennis drove the van from Honolulu to Kaneohe. In Kaneohe, Barbara got out of the van, removed the van's dome light, returned to the van, and sat in the front passenger seat. They continued driving and ended up in the Pearl Harbor area. At Pearl Harbor, the road was blocked by a military gate,[2] so they reversed and proceeded to Waianae.

On the way to Waianae, William told Vo to lie down on the floor of the van. Vo did as he was told, lying down between the front and center rows. William, who was still holding the knife, took Vo's watch, necklace, cell phone, and money that was in Vo's pocket. One of the passengers took Vo's wallet. William told Vo to look at him, and when Vo did so, William punched him in the face three or four times.

At some point on the way to Waianae, the van stopped and William changed places with Dennis and became the driver. Dennis stepped on the back of Vo's head and on Vo's back, wrapped a tie[3] around Vo's neck, and pulled Vo up with the tie, choking him. Dennis asked Vo something along the lines of "Who's your father?" or "Who's your daddy?" On the way to Waianae, Dennis also punched, kicked, and stepped on Vo many times. Vo asked Dennis to stop punching and kicking him, but Dennis continued to do so. After Dennis choked Vo with Vo's tie, Dennis pointed the knife at Vo.

Vo asked William to let him out of the van and told William to take the van. Vo told William that he just wanted to

---

[2] Dennis testified that they ended up at Pearl Harbor military base because he did not know where he was going and Barbara told him to turn around because they were going to pass "where the MP's were."

[3] Dennis testified that Vo was wearing a red tie at the time of the incident.

stay alive so he could take care of his children.  William said Vo should not worry, William would not beat up Vo because William also had children.  William stated that he wanted to find a place to get out of the van, but he did not want Vo to know where.

When the van stopped in Waianae, the passengers told Vo to stay down.  Someone choked Vo with their hands, and Vo lost consciousness.  Before the passengers left the van, they told Vo not to look up for ten minutes so he would not know in what direction they went after they left and not to call the police or his family would be killed.  The passengers left the van, taking the taxi's two radios with them.  A police officer arrived on the scene seven to ten minutes later.

### 2.    Oral Motion for Judgment of Acquittal

After Vo testified, Dennis's counsel orally moved for judgment of acquittal, which the circuit court denied.

### 3.    Other Witnesses' Testimony

Numerous other witnesses, including Honolulu Police Department officers and Dr. Saltman testified on behalf of the State.

### 4.    Dennis's Testimony

### (a)    Direct examination

Dennis's testimony was similar to Vo's in some respects, but he also testified to the following.  William was Dennis's older brother.  At the time of the incident, Dennis was living in Waikiki with his fiancee and some friends.  William was living in Waianae with Barbara, who was William's girlfriend.  A few days before the incident, Dennis and William had gotten into a little argument because William wanted to live with Dennis in Waikiki and Dennis told him no.  Dennis testified that he did not want William to live with him, "Just 'cause of -- from what his background is, from what I heard of his drug action and all." Dennis had not had any contact or communication with William from the time of the argument to the time of the incident.  Dennis and William were not close and had not spent a lot of time together for quite a few years.

On the morning of the incident, Dennis was walking to Waikiki when he heard Barbara behind him, calling his name. Dennis kept walking, but Barbara approached him and started talking to him. She told him that he and William should try to "patch things up" and "get to know each other again" after all the years they had been separated. Dennis noticed a van following them. Barbara told him that William was sorry, was in the van, and wanted them to forget that the argument had occurred. Dennis finally agreed and got in the van.

Dennis sat behind the driver's seat, in the second row; William was in the front passenger seat. William told Dennis that he was sorry they argued and they should try to make amends. They gave each other a sort of high five/fist thing as a peace gesture. Barbara told Dennis they were going to her aunt's house. Vo drove to Lanakila and stopped the van. William and Dennis got out, and they talked about why Dennis did not want William to live with him. Barbara said they were going to Foodland to get money from an ATM. William and Dennis got back in the van, switching seats, and Vo drove them to the ATM.

After Barbara went to the ATM and came back, Vo drove the van back to Lanakila and parked. William grabbed Vo and put the knife to Vo's side. William told Dennis to drive the van. William tried to put Vo in the console area between the passenger and driver's seats. Dennis did not know that William was going to do what he did. Dennis testified he was thinking "oh, hell no," and it "kind of tripped [him] out."

Dennis switched to the driver's seat and drove the van, although he did not know where he was supposed to go. William had the knife to Vo's neck. Dennis testified that "as my knowledge of my brother's background, I didn't know what was going to happen next." Dennis thought it was just best to listen. He did not know what was going on behind him in the van because the radio was on.

Dennis's counsel asked Dennis what he thought was going on between Vo and William while they were driving by Pearl Harbor:

> A. [DENNIS]  I wasn't really thinking about them.  I was just thinking of what I was gonna do, you know what I mean?
>
> Q. [DENNIS'S COUNSEL]  Okay.  What do you mean by that?  What were you going to do?
>
> A.  How could I get out of this situation without, you know what I mean, either me getting hurt or somebody else, I mean.
>
> Q.  Were you worried about your brother?
>
> A.  As of what he was going to do to Mr. Vo?
>
> Q.  Yeah.
>
> A.  A little because I know his background.

While driving to Waianae, he could hear William talking to Vo, but not what William was saying, and could hear William beating up Vo.  Dennis just hoped that William would not badly hurt Vo.  When asked if he was worried about how hurt Vo was, Dennis responded:

> A. [DENNIS]  I was worried about him but I was more worried about myself, you know what I mean?
>
> Q. [DENNIS'S COUNSEL]  Um-hum.  Did you feel bad about what your brother was doing?
>
> A.  I felt bad for Vo, but is -- you know what I mean? My brother had the knife, what else -- what -- you know what I mean?  I'm unarmed.  What am I supposed to do here?

Dennis heard William telling Vo to take off Vo's tie, but he did not see a tie "wrapped on or around" Vo at any time during the incident.

As soon as Dennis parked the car in Lualualei, he said "the keys are out on the driver's side" and walked away.  He left the keys on the ground.

Dennis testified that he did not hurt, hit, punch, kick, or stomp Vo at any time during the incident.  Dennis was pretty sure William had done so, but Dennis had not actually seen him do it.  Dennis testified that he did not take anything from Vo or know what was taken from Vo and William and Barbara did not offer to give him anything.  Dennis stated that when he left the van, he felt hurt that William had put him in that situation.

### (b) Oral motion for a Hawaii Rules of Evidence (HRE) Rule 404 ruling

After Dennis's counsel concluded his direct examination of Dennis, the State moved for an HRE Rule 404 ruling:

> [THE STATE]: At this time the State would ask this court to make a ruling on 404 for the following reasons. Based on [Dennis's] testimony, the impression that he left with the jury is that his older brother William not only is involved in drug activity but is, clearly, the impression is, that he is the violent one. The impression also that was left with the jury is that [Dennis] is not violent, he was a non-participant, and it was his brother who was violent. As [Dennis's counsel] should be aware right now, [William] has no convictions for violent activity. His only felony conviction was for a theft.
>
> . . . .
>
> It's a Second Circuit, Maui case. [William] stole more than $300 of merchandise from K-Mart. That's all he has.
>
> [Dennis], on the other hand, has a conviction for Robbery 1 with the use of a knife, and Robbery 2. It was provided in discovery. I have the case number. These are from '95 and '97, Second Circuit. The prosecutor's argument is that he's opened the door because he left the impression that he's not a violent guy.
>
> THE COURT: Okay.
>
> [DENNIS'S COUNSEL]: We would obviously object. We didn't open the door at all. [Dennis] gave no indication that he himself is a peaceful person in general, just that on this particular incident he didn't commit anything, any violent acts. That doesn't open the door to at all his priors.
>
> With respect to his brother, we're not claiming he has -- we didn't put on any evidence that he has violent convictions or criminal convictions, just that, you know, they're brothers, they grew up together, he's seen prior instances of violent behavior by his brother, even though obviously not convicted.
>
> THE COURT: Okay. I'm going to find that three different times the defendant talked about his brother's background. I agree with [the State] and I believe I explained this to your client [at the pretrial hearing] that the door is closed right now, but if based on his testimony he may give the wrong impression, [the State] may ask to approach. That's exactly what happened.
>
> I think he's indicated that based on his brother's background and drugs and he may be able to say it further about drugs, I don't know about that, but that he gave the impression that his brother's a dangerous guy and I think by inference that he is not and so he has reason to fear him and everything else, and the fact that he has prior convictions for Robbery in the First Degree and Robbery in the Second Degree, I think, are appropriate so I'm going to allow [the State] to cross-examine him on those two.

### (c)   Cross-examination

The State asked Dennis about his previous comments regarding his fear of William.  Dennis testified that he did not know about William's conviction for felony theft.  Dennis admitted that he, himself, had a 1996 conviction for Robbery in the First Degree (prior Robbery I) stemming from an incident in which he pulled a knife on a man and threatened to stab the man and cut his throat if the man did not give him $10.  Dennis also admitted that he had been convicted in 1994 of Robbery in the Second Degree (Robbery II) stemming from an incident in which he assaulted a man for $24 in cash and $26 in food stamps.  The State asked Dennis, "[J]ust to be clear, you're not telling the jurors that you're somehow a peaceful, non-violent person, are you?", and Dennis responded, "No, I'm not."

Dennis testified that at the time of the incident, he weighed about 215 pounds and was about five feet, eight inches tall.  William weighed about 155 pounds and was about Dennis's height.  Dennis stated that at the time of his arrest he was probably physically stronger than William.

Dennis admitted that although he testified he had not seen William for several days prior to the incident, he was actually with William and Barbara the day before the incident.  They were in a car, which Barbara was driving, when Barbara received a traffic citation.

Dennis and the State engaged in the following exchange:

> Q. [THE STATE]  Will you please explain to us why you were thinking about your kids as [Vo] was getting tuned up in the back of the van?
>
> A. [DENNIS]  Because, like I said, it's my brother, I know my brother's background and his attitude.  I wouldn't know what he would have done to me if I didn't help him out.
>
> Q.  So is it your testimony now that your brother made you participate in this?
>
> A.  Well, he did have the upper hand with the knife.
>
> Q.  Is it your testimony that you were powerless against your brother?
>
> A.  I was weaponless.  I didn't have nothing to back myself up if he came with the knife to me.

Q. [Dennis], the only thing that your brother's been convicted of is shoplifting at K-Mart, right?

A. Like I said, I have no idea what his record is.

Q. But your record is using a knife to rob people, right?

A. Many years ago, yes.

Q. And also beating up people for $24 in cash and $26 in food stamps, right?

A. When I was 18.

Later, the State asked Dennis if while driving the van, he had any reason to believe Vo was hurt:

A. [DENNIS]  I could have speculated that --

Q. [THE STATE]  What would that speculation have been based on?

A. Me knowing -- being raised with my brother.

Q. That your brother's violent?

A. Well, of me being raised with him while he's on drugs.

Q. And that your brother was probably hurting [Vo] in the back?

A. Probably.

Dennis testified that Vo and his van were left in a dirt lot, behind some bushes.  No one driving along the road nearby could have seen Vo's van.  Dennis, however, believed the lot was safe.

### (d)   Recross-examination

Dennis testified that he did not run away from the van during the incident because of what William might have done to him and Vo.  Dennis stated that his brother might have done something to them "[b]ecause of his drug habit and as -- I know as hanging around him while I was growing up, I know his actions."  When asked, "So he would not just use drugs but he must be doing something violent, that's what you're talking about, right?", Dennis responded, "It could be anything."  Dennis testified, "I know he hangs around gangs and all that . . . . You put two and two together . . . .  It's just he knows where I live . . . . . So I -- more worried about my fiancee and my daughter at that time."

### 4. Renewed Oral Motion for Judgment of Acquittal

After Dennis testified, his counsel orally renewed the motion for judgment of acquittal, which the circuit court denied.

### 5. Hearing on Jury Instructions

On June 3, 2008, the circuit court held a hearing to settle the jury instructions. At the start of the hearing, the circuit court made further findings regarding its decision to allow the State to introduce evidence of Dennis's prior convictions:

> [T]he Court wanted to place on the record the further findings and statements regarding when [Dennis] was testifying, that it was the Court's determination that he gave the jury the impression of helpless victimization, and that was based on his demeanor, his -- the impression he created with, he's got a short haircut, he's clean-shaven, he's got glasses, he's speaking in a meek and mild fashion.
>
> His weight at the time, which had not been presented to the jury, was he [sic] 215 pounds at the time of the -- of this incident, and his brother, William, was 155 pounds.
>
> [Dennis] was five, eight. His brother's six, five [sic].
>
> He was saying he was fearful and scared of his brother.
>
> And on three occasions as part of his testimony he talked about his brother's background in drug use and how he gets, and how that made him scared and fearful.
>
> And the Court, in looking at all of this, did a 403 balancing test and it weighed the dangers of unfair prejudice, the probative value against unfair prejudice, and it was the Court's determination that [Dennis] was creating a false impression with the jury that he was a helpless victim in relation to his brother.
>
> And this was confirmed later when, despite me giving repeated chances to amplify on why his brother was scary or dangerous, he never came up with a single example of saying that he was even unaware based on [the State's] questioning that his brother had been convicted of a felony, albeit a nonviolent shoplifting type of case.
>
> And in this case, that while [Dennis] did not specifically come out and say, I don't have any prior violent felonies, or the like, by his words, demeanor and conduct he left the Court and the jury with a false impression, i.e., that he was a passive, helpless victim in relation to his brother.
>
> And the Court determined that by doing so he opened the door to the Prosecution to give a more balanced view of his past so the jury could weigh more appropriately and judge for themselves.

> And in this case now, we have a choice of evils
> situation for the jury to consider, as well as duress.
>
> And that, again, doing the careful 403 balancing test,
> the probative nature of the evidence of his -- limited to
> the two prior violent convictions, the probative value of
> those outweighs the danger of unfair prejudice.
>
> At the same time a limiting instruction will be given
> to instruct the jurors on how to consider, that it's not
> that [Dennis] is a person of bad character, but that it's
> offered for the stated 404(b) factors, as well as to rebut
> the impression that he's a peaceful, nonviolent person and a
> helpless victim in this situation, if for no other purpose.

Dennis's counsel renewed his objection to the admission of the evidence:

> Again, just to point out that the Court -- as the
> Court stated, there was no direct evidence by [Dennis] that
> he, himself, is a peaceful, nonviolent person, but the Court
> only found that there was an inference.
>
> With respect to being a helpless victim, his testimony
> was not that he's 215 pounds, his brother was 155, and he
> was scared.
>
> The point was that -- not the weight of his brother,
> but the fact that his brother had possession of the knife at
> the time.
>
> Regardless of the difference in weight, knowing his
> brother had a knife and he didn't have any weapon, that was
> the main point of his concern with respect to his brother.
>
> Also, we would be noting that there was no limiting
> instruction given to the jury at the time the evidence was
> admitted.
>
> And, furthermore, that these two cases of robbery
> against [Dennis] that were admitted took place over ten
> years ago[.]

The circuit court responded:

> Well, I believe [Dennis's] testimony was that there was a
> knife, he was concerned at the time and he was concerned
> later on about possible retaliation, and otherwise. So it
> encompassed more than just the situation at the scene.
>
> It was later on when presumably he  . . wouldn't have
> a knife[.]
>
> And the Court ruled as it did based on that.

The State responded to Dennis's counsel's argument that the circuit court had erred by failing to give the jury a timely limiting instruction when the court admitted evidence of Dennis's prior convictions. The State argued that the jury's recollection of Dennis's testimony would not have "dimmed" between the time

Dennis testified and when the jury received a limiting instruction because no evidence had been admitted since Dennis testified. The State maintained that a limiting instruction given with the rest of the jury instructions would be timely.

### 6. Jury Instructions

As part of the jury instructions, the circuit court gave the following instruction:

> You have heard evidence that [Dennis] at another time may have engaged in or committed other crimes, wrongs or acts. You must not use this evidence to determine that [Dennis] is a person of bad character and, therefore, must have committed the offenses charged in this case.
>
> Such evidence may be considered by you only on the issue of [Dennis's] motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, absence of mistake or accident or to rebut the suggestion or inference that [Dennis] is a peaceful and nonviolent or a helpless victim and for no other purpose.

### 7. Closing Arguments

In the State's closing rebuttal, it argued:

> Well, duress does not apply.
>
> First of all, [Dennis] by his own testimony was never threatened by his brother.
>
> Recall my questions of him? What did your brother do to you. Oh, nothing. But I know how he is.
>
> I gave him numerous opportunities to explain how his brother threatened him directly. He couldn't come up with a single one.
>
> And remember, you've heard testimony that [Dennis] has done other things. Do not think that he is some sort of a hapless victim who was in the wrong place at the wrong time doing his brother's bidding.
>
> He has committed a knife-point robbery and beaten another person in a robbery.
>
> This evidence can be considered by you to refute the suggestion that somehow he was just there and caught up in this case.

In his closing sur-rebuttal, Dennis's counsel argued:

> We know that William is dangerous. We know that. [Dennis] testified that his brother is a drug addict. And when he's on drugs he doesn't know what he's going to do or is capable of doing.
>
> He also knows that when they were growing up, that his brother William could be violent. It's a very dangerous combination. A person who has a history of violence, and is on drugs.

> And that's what Dennis knew about William that day.
>
> . . . .
>
> But keep in mind what Dennis did when he was 18, 19 years old, he's in his 30's now. It's over 12 years ago at least when he made those mistakes. It's been 12 years.

### 8. Verdict

The jury found Dennis guilty of all charges.

### C. POST-TRIAL

On October 7, 2008, Dennis filed a Motion for a New Trial. Dennis argued that at trial, the circuit court erroneously admitted evidence of his prior convictions. Dennis maintained that he did not directly testify that he was a peaceful person and the circuit court should not have relied on his demeanor at trial to support its ruling. He contended the circuit court should not have admitted the evidence, pursuant to HRE Rules 401, 402, and 403. Dennis also argued that the verdict was manifestly against the weight of the evidence because there was not a "requisite finding of a theft" by him.

On October 10, 2008, the State filed a memorandum in opposition. On December 3, 2008, the circuit court filed Findings of Fact, Conclusions of Law, and Order Denying Defendant Dennis Brooks' Motion for New Trial. The circuit court denied the motion on the basis that it was untimely filed, under Hawaii Rules of Penal Procedure (HRPP) Rules 33 and 45. The circuit court alternatively denied the motion on the bases that Dennis's "arguments in support of the motion are speculative," the "verdict was not manifestly against the weight of the evidence," and a "new trial is not required in the interests of justice."

The circuit court filed the Judgment on December 9, 2008, and Dennis timely appealed.

## II.

### A. ADMISSIBILITY OF PRIOR BAD ACT EVIDENCE

> The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. *State v. Pulse*, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996).
>
> When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied

> in the case of those rules of evidence that
> require a "judgment call" on the part of the
> trial court.

Id. at [246], 925 P.2d at [814] (citations omitted).

> "Prior bad act" evidence under [HRE] Rule
> 404(b) . . . is admissible when it is 1)
> relevant and 2) more probative than prejudicial.
> A trial court's determination that evidence is
> "relevant" within the meaning of HRE Rule 401
> (1993) . . . is reviewed under the right/wrong
> standard of review. However, a trial court's
> balancing of the probative value of prior bad
> act evidence against the prejudicial effect of
> such evidence under HRE Rule 403 . . . is
> reviewed for abuse of discretion. An abuse of
> discretion occurs when the court clearly exceeds
> the bounds of reason or disregards rules or
> principles of law to the substantial detriment
> of a party litigant.

> State v. Torres, 85 Hawai'i 417, 421, 945 P.2d 849,
> 853 (App. 1997) (footnotes[, internal quotation marks,
> and citations] omitted).

State v. Cordeiro, 99 Hawai'i 390, 403-04, 56 P.3d 692,
705-06 (2002).

State v. Fetelee, 117 Hawai'i 53, 62-63, 175 P.3d 709, 718-19
(2008).

**B.   GENERAL ENTITLEMENT TO INCLUDED OFFENSE
       INSTRUCTIONS**

In State v. Kupau, 76 Hawai'i 387, 396 n.14, 879 P.2d
492, 501 n.14 (1994), *overruled on other grounds by* State v.
Haanaio, 94 Hawai'i 405, 16 P.3d 246 (2001), the Hawai'i Supreme
Court stated that

> although there may be sufficient evidence to support a
> guilty verdict as to a charged offense, if the weight of the
> evidence is to the contrary but supports guilt as to an
> included offense, the trial judge would be justified in
> giving an instruction regarding the included offense[.]

In State v. Kinnane, 79 Hawai'i 46, 897 P.2d 973
(1995), the Hawai'i Supreme Court stated:

> When a defendant in a criminal case timely asks for a
> lesser included offense instruction to which he or she is
> entitled, it is reversible error not to give it. On the
> other hand, a trial court is not obligated to charge the
> jury with respect to an included offense unless there is a
> rational basis in the evidence for a verdict acquitting the
> defendant of the offense charged and convicting him of the
> included offense.

> Indeed, in the absence of such a rational basis in the
> evidence, the trial court *should not* instruct the jury as to
> included offenses. *A fortiori,* it is not error for a trial
> court to refuse -- and the trial court should refrain from

16

giving -- an instruction regarding an uncharged offense that is not included, for purposes of the Hawai'i Penal Code, within the charged offense.

Where there *is* such a rational basis in the evidence, however, we have held that it may be plain error for a trial court to fail to give an included offense instruction even when neither the prosecution nor the defendant have requested it; this is because

the trial court is the *sole source* of all definitions and statements of law applicable to an issue to be resolved by the jury. Moreover, it is the *duty of the circuit judge* to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he or she shall state to them fully the law applicable to the facts. And faced with inaccurate or incomplete instructions, the *trial court has a duty to,* with the aid of counsel, either correct the defective instructions or to otherwise *incorporate it into its own instructions.* In other words, the ultimate responsibility properly to instruct the jury lies with the circuit court and *not* with trial counsel.

. . . .

Thus, in order to reconcile the competing interests of the prosecution and defendants, as well as to ensure that juries are appropriately instructed in criminal cases, we hold as follows: The trial judge must bring all included offense instructions that are supported by the evidence to the attention of the parties. The trial judge must then give each such instruction to the jury unless (1) the prosecution does not request that included instructions be given and (2) the defendant specifically objects to the included offense instructions for tactical reasons. If the prosecution does not make a request and the defendant makes a tactical objection, the trial judge must then exercise his or her discretion as to whether the included offense instructions should be given. The trial judge's discretion should be guided by the nature of the evidence presented during the trial, as well as the extent to which the defendant appears to understand the risks involved.

Kupau, 76 Hawai'i 394-96, 879 P.2d 499-501 (citations, footnotes, internal quotation marks, and brackets omitted) (emphasis in original).

79 Hawai'i at 49-50, 897 P.2d at 976-77 (internal quotation marks, citations, footnotes, and brackets omitted; emphasis in original).

C.    SUFFICIENCY OF THE EVIDENCE

The appellate court reviews the sufficiency of evidence on appeal as follows:

[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the

> case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting State v. Quitog, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Richie, 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted).

### D. SENTENCING

> A sentencing judge generally has broad discretion in imposing a sentence. The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. Factors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions. And, generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Mundon, 121 Hawai'i 339, 349, 219 P.3d 1126, 1136 (2009) (quoting State v. Kahapea, 111 Hawai'i 267, 278, 141 P.3d 440, 451 (2006)).

### E. JURY INSTRUCTIONS

> The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. In other words, error is not to be viewed in isolation and considered purely in the abstract.

State v. Kassebeer, 118 Hawai'i 493, 504, 193 P.3d 409, 420 (2008) (internal quotation marks, citations, and brackets omitted) (quoting State v. Mainaaupo, 117 Hawai'i 235, 247, 178 P.3d 1, 13 (2008)).

The standard of review for jury instructions that were not objected to at trial was clarified in State v. Nichols, 111 Hawai'i 327, 141 P.3d 974 (2006), where the Hawai'i Supreme Court held that

> although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure

> (HRPP)] Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt.

Id. at 337, 141 P.3d at 984 (footnote omitted). Thus, the appellant must first demonstrate instructional error by rebutting the "presumption that unobjected-to jury instructions are correct." Id. at 337 n.6, 141 P.3d at 984 n.6; accord State v. Eberly, 107 Hawai'i 239, 250, 112 P.3d 725, 736 (2005). If the appellant is able to rebut this presumption, the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt because

> [e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.

Nichols, 111 Hawai'i at 334, 141 P.3d at 981 (brackets in original omitted) (quoting State v. Gonsalves, 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005)).

### III.

#### A. PRIOR BAD ACTS EVIDENCE

Dennis contends the circuit court abused its discretion in allowing the State to adduce at trial evidence of his prior convictions.

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401. Generally, all relevant evidence is admissible. HRE Rule 402. However, HRE Rule 404 (Supp. 2009) provides in relevant part:

> **Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.** (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent trait of character of an accused offered by an accused, or by the prosecution to rebut the same;

. . . .

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

In State v. Clark, 83 Hawai'i 289, 300-01, 926 P.2d 194, 205-06 (1996), the Hawai'i Supreme Court stated:

The list of permissible purposes in Rule 404(b) is not intended to be exhaustive "for the range of relevancy outside the ban is almost infinite." E.W. Cleary, *McCormick on Evidence* § 190, at 448 (Cleary ed. 1972). In *United States v. Miller,* 895 F.2d 1431 (D.C. Cir. 1990), *cert. denied,* 498 U.S. 825, 111 S. Ct. 79, 112 L. Ed. 2d 52 (1990), the United States District Court of Appeals for the District of Columbia explained:

[Rule 404(b)] was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the one *impermissible* purpose for such evidence. "Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a [person] who commits a crime probably has a defect of character; a [person] with a defect of character is more likely than [people] generally to have committed the act in question." 2 J. Weinstein & M. Berger ¶ 404(8) at 404-52. In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character. The Government's right to introduce bad-acts evidence for purposes other than showing a defendant's criminal propensity is by no means unlimited. But the limits derive from the "general strictures limiting admissibility such as Rules 402 and 403," not from Rule 404(b). *Huddleston [v. United States,* 485 U.S. 681, 688], 108 S. Ct. [1496] at 1500 [, 99 L. Ed. 2d 771 (1988)].

*Id.* at 1436.

See also State v. Arakawa, 101 Hawai'i 26, 34, 61 P.3d 537, 545 (App. 2002) (internal quotation marks and citation omitted) ("[T]he supreme court [has] observed that the list of permissible purposes enumerated in HRE Rule 404(b), such as motive and intent, was not intended to be exhaustive.").

Further, in <u>State v. Steger</u>, 114 Hawai'i 162, 158 P.3d 280 (App. 2006), this court stated:

> In ruling on whether to admit evidence under HRE Rule 404(b), the trial court must consider a variety of factors. *State v. Robinson*, 79 Hawai'i 468, 471, 903 P.2d 1289, 1292 (1995). These include:
>
>> the strength of the evidence as to the commission of the other bad acts, the similarities between the [other] bad acts [and the charged crime], the time that has elapsed between the [other] bad acts [and the charged crime], the need for the evidence, the efficacy of alternate proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility.
>
> *Id.*

<u>Id.</u> at 172, 158 P.3d at 290.

In <u>Kassebeer</u>, 118 Hawai'i at 507, 193 P.3d at 423, the Hawai'i Supreme Court stated that the use of the word "may" in "HRE Rule 404(b)'s directive that evidence of a prior bad act 'may' be admissible . . . was intended to trigger an inquiry under HRE Rule 403, . . . which provides in relevant part that, '[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'"

### 1.    **Steger** Factors

The first <u>Steger</u> consideration is "the strength of the evidence as to the commission of the other bad acts." 114 Hawai'i at 172, 158 P.3d at 290. The evidence of Dennis's other bad acts is strong, as it is undisputed that Dennis had the prior Robbery I and Robbery II convictions in the Circuit Court of the Second Circuit. As for the second <u>Steger</u> factor, "the similarities between the [other] bad acts [and the charged crime]," <u>id.</u>, the Robbery in the First Degree in the instant case clearly was similar to the prior Robbery I and Robbery II charges because all three offenses involved robbery. Further, Dennis used a knife in the prior Robbery I case and in the instant case.

The fourth <u>Steger</u> factor, the "need for the evidence," 114 Hawai'i at 172, 158 P.3d at 290, mitigates in favor of admitting the prior convictions. In the instant case, the circuit court found that at trial, Dennis opened the door to the State's introduction to the evidence because

> while [Dennis] did not specifically come out and say, I
> don't have any prior violent felonies, or the like, by his
> words, demeanor and conduct he left the Court and the jury
> with a false impression, i.e., that he was a passive,
> helpless victim in relation to his brother.

The circuit court found that Dennis created that false impression by testifying "he was fearful and scared of his brother" and testifying three different times about "his brother's background in drug use and how [his brother] gets, and how that made him scared and fearful." The circuit court further found that the evidence of Dennis's prior convictions was necessary to give the jury "a more balanced view of [Dennis's] past so the jury could weigh more appropriately and judge for themselves." We agree that the evidence was needed to counterbalance the impression of himself Dennis created at trial. Dennis testified as follows:

(1) He did not want William to live with him "[j]ust 'cause of -- from what his background is, from what I heard of his drug action and all."

(2) When William put the knife to Vo's side and told Dennis to drive the van, Dennis did not know that William was going to do what he did, and "as my knowledge of my brother's background, I didn't know what was going to happen next." Dennis thought it was just best to listen.

(3) During the incident, Dennis was a little worried about what William would do to Vo because Dennis knew William's "background."

(4) Dennis was worried about what William would do to him because William had a knife and Dennis was unarmed. William "had the upper hand" with the knife.

(5) Dennis was thinking about his own safety and that of his children during the incident because he knew William's "background and his attitude" and Dennis did not know what William would have done to him if he did not "help him out." Dennis testified that William hung "around gangs and all that . . . . You put two and two together . . . . It's just he knows where I live[.]"

(6) While driving the van, Dennis could "speculate" that William probably was hurting Vo because Dennis knew William

and William had done drugs when they were growing up together. William might have done something to Dennis and Vo "[b]ecause of his drug habit and as -- I know as hanging around him while I was growing up, I know his actions."

(7) When William was doing drugs, William could do "anything."

Dennis did not testify that he was peaceful or non-violent; in fact, he testified that he was not telling the jury he possessed those qualities. Further, Dennis testified that he was afraid of William during the incident in part because William wielded a knife and Dennis was unarmed. However, Dennis's repeated references to William's "background," which made Dennis afraid of William; Dennis's testimony that he did not know what William had planned to do to Vo when Dennis got into the van; Dennis's testimony that William was affiliated with gangs and had used drugs and could do "anything" when on drugs; and the circuit court's undisputed findings that at trial, Dennis's hair was short and he was clean-shaven, had glasses on, and was speaking in a meek and mild fashion -- whereas at the time of his arrest, Dennis had long hair and wore a short-sleeved T-shirt revealing multiple tattoos -- combine to suggest Dennis intended to impress upon the jury that he was peaceful, whereas William was not.

Two of the Steger factors weigh in favor of denying the State's motion to admit the evidence. The third Steger factor is the "time that has elapsed between the [other] bad acts [and the charged crime]." 114 Hawai'i at 172, 158 P.3d at 290. In Kassebeer, 118 Hawai'i at 507, 193 P.3d at 423, the Hawai'i Supreme Court stated that "[t]he passage of time diminishes the probative value of prior bad act evidence." Dennis was convicted of the prior Robbery I charge in 1996 and the Robbery II charge in 1994. The complaint in the instant case alleged that in 2006 he committed the offenses charged. Over ten years had passed since Dennis had been convicted of the prior offenses. The sixth Steger factor is the "degree to which the evidence will probably rouse the jury to overmastering hostility." 114 Hawai'i at 172, 158 P.3d at 290. In this case, it is possible that the evidence

had a prejudicial effect on the jury.  See State v. Murray, 116 Hawai'i 3, 20, 169 P.3d 955, 972 (2007) (emphasis in original) (noting that "the risk of tainting the jury verdict with evidence of prior convictions is of especial concern when the current charge is for the same crime of which the defendant was previously convicted.").

We recognize that this is not an easy issue to resolve, but for the reasons we have discussed -- primarily with regard to the third Steger factor -- and applying the test set out in HRE Rule 403, we cannot hold that the circuit court abused its discretion in admitting the evidence.  We note that the circuit court gave the jury a limiting instruction that the evidence "must not" be used to determine that Dennis was a "person of bad character and, therefore, must have committed the offenses charged in this case."  The circuit court also instructed the jury to consider the evidence only, among other things, "to rebut the suggestion or inference that [Dennis] is a peaceful and nonviolent or a helpless victim and for no other purpose."  The prejudicial effect of prior bad-act evidence can be reduced or eliminated by proper jury instructions.  See State v. Balanza, 93 Hawai'i 279, 289, 1 P.3d 281, 291 (2000) (admission of evidence may result in some potential for prejudice, but such prejudice may be effectively dispelled by jury instructions); State v. Cordeiro, 99 Hawai'i 390, 416, 56 P.3d 692, 718 (2002) (potential for unfair prejudice dispelled by circuit court's limiting instruction to the jury).  The jury is presumed to follow the court's instructions.  State v. Kupihea, 80 Hawai'i 307, 317-18, 909 P.2d 1122, 1132-33 (1996); State v. Knight, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996).

### 2.   Limiting Instruction

Dennis argues that "the limiting instruction by the court failed to cure the overwhelming prejudicial effect of the evidence" because "the instruction was given four days after the jury had heard the evidence."  Dennis argues that the prejudice caused by the circuit court's delay in giving the instruction was compounded by the instruction's (1) unnecessary recitation of the

evidence's permitted purposes (motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, absence of mistake or accident), which were inapplicable in this case, and (2) invitation to the jury to consider whether the evidence "rebut[ted] the suggestion that Dennis was 'peaceful and nonviolent or a helpless victim,'" which amounted to permission "to utilize the evidence as propensity evidence."

With regard to Dennis's argument that the limiting instruction was given too late to cure any prejudicial effect the prior conviction evidence may have had, Dennis did not request a limiting instruction or object to the lack of a limiting instruction after his prior conviction was introduced as evidence. The appropriate instruction was given to the jury at the conclusion of the trial. Dennis waited until just before the circuit court instructed the jury to object to the court's failure to give the instruction when the evidence was introduced. "The trial judge must consider on a case-by-case basis whether to issue a limiting instruction when HRE Rule 404(b) evidence is introduced and/or at the conclusion of the trial. There is no bright line rule." Cordeiro, 99 Hawai'i at 418-19, 56 P.3d at 720-21. Given Dennis's failure to object to the lack of a limiting instruction at the time the evidence was given at trial, coupled with the fact that no other evidence was presented to the jury from the time the prior conviction evidence was presented and the circuit court gave the limiting instruction, Dennis was not prejudiced by the court's delay in giving the instruction.

With regard to his arguments about the substance of the limiting instruction, Dennis did not object to the instruction on this basis at trial. Dennis provides no authority for the notion that the instruction's inclusion of all of the permissible uses of prior bad act evidence under HRE Rule 404(b), even though those uses were inapplicable to this case, rendered the instruction prejudicially insufficient, erroneous, inconsistent, or misleading. Further, he provides no authority for the idea that permitting the jury to consider the prior convictions to rebut the presumption that Dennis was "a peaceful and nonviolent

25

or a helpless victim" amounted to an instruction to consider the evidence for propensity.  Given our holding that the jury needed to consider the prior convictions to rebut the impression created at trial that Dennis was a peaceful person, the instruction was not prejudicially insufficient, erroneous, inconsistent, or misleading.

In the light of the foregoing, the circuit court did not plainly err by giving the limiting instruction.

### B.   JURY INSTRUCTIONS ON INCLUDED OFFENSES

Dennis argues that the circuit court erred when it failed to instruct the jury on Robbery in the Second Degree and Theft in the Fourth Degree, which were included offenses of Robbery in the First Degree.  Brooks maintains that because of the omission, the court's instructions were prejudicially erroneous, incomplete, or misleading.

The State charged Dennis with Robbery in the First Degree, in violation of HRS § 708-840(1)(b)(i).  A person commits Robbery in the First Degree if in the course of committing theft, "the person is armed with a dangerous instrument" and "uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance."  HRS § 708-840(1)(b)(i).  Robbery in the Second Degree and Theft in the Fourth Degree are included offenses of Robbery in the First Degree.  State v. Arlt, 9 Haw. App. 263, 277, 833 P.2d 902, 910 (1992) (Robbery in the Second Degree is an included offense of Robbery in the First Degree); State v. Mitsuda, 86 Hawaiʻi 37, 46, 947 P.2d 349, 358 (1997) (Theft in the Fourth Degree is an included offense of Robbery in the First Degree).  HRS § 708-841 (1993) provides in relevant part:

> §708-841  Robbery in the second degree.  (1) A person commits the offense of robbery in the second degree if, in the course of committing theft:
>
> (a)   The person uses force against the person of anyone present with the intent to overcome that person's physical resistance or physical power of resistance;
>
> (b)   The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property; or

> (c) The person recklessly inflicts serious bodily injury upon another.

HRS § 708-833 (1993) provides that "[a] person commits the offense of theft in the fourth degree if the person commits theft of property or services of any value not in excess of $100."

In State v. Haanio, 94 Hawai'i 405, 16 P.3d 246 (2001), the Hawai'i Supreme Court stated the following with regard to included offense instructions:

> [T]he trial court's failure to give appropriate included offense instructions requested by a party constitutes error, as does the trial court's failure to give an appropriate included offense instruction that has not been requested. Such error, however, is harmless when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the instructions. The error is harmless because jurors are presumed to follow the court's instructions, and, under the standard jury instructions, the jury, in reaching a unanimous verdict as to the charged offense or as to the greater included offense, would not have reached, much less considered, the absent lesser offense on which it should have been instructed.

Id. at 415-16, 16 P.3d at 256-57 (internal quotation marks, citations, footnote, and brackets in original omitted; emphasis added); see also, State v. Pauline, 100 Hawai'i 356, 381, 60 P.3d 306, 331 (2002) (even if rational basis existed to instruct jury on included offenses within murder second, error was harmless because jury found Pauline guilty as charged); State v. French, 104 Hawai'i 89, 93-94, 85 P.3d 196, 200-01 (App. 2004) (assuming it was error to not give the jury included theft instructions, it was harmless error because jury found French guilty of the greater offense of robbery second); State v. Gunson, 101 Hawai'i 161, 165-66, 64 P.3d 290, 294-95 (App. 2003) (the absence of included offense jury instructions, if error, was harmless beyond a reasonable doubt where Gunson was found guilty of charged offense, making it unnecessary for the appellate court to determine if indecent exposure is an included offense of fourth degree sexual assault).

In the instant case, without addressing whether there was a rational basis for jury instructions on the subject of included offenses, we hold that any such error would have been

harmless because the jury convicted Dennis of Robbery in the First Degree.

### C. INSUBSTANTIAL EVIDENCE

Dennis contends the circuit court erred in convicting him of Robbery in the First Degree because there was insubstantial evidence to support the conviction. We disagree and hold that when "considered in the strongest light for the" State, "there was substantial evidence to support the conclusion of the trier of fact." Richie, 88 Hawai'i at 33, 960 P.2d at 1241.

### 1. Robbery in the First Degree

There was sufficient evidence to convict Dennis of Robbery in the First Degree. Vo testified at trial that when William put a knife about five-to-five-and-a-half-inches long to his neck and asked for Vo's money, Dennis held down Vo's hands.[4] Both William and Dennis asked Vo where his money was. William and Dennis took Vo's driver's license out of his wallet and told him more than once that if he reported the incident to the police, they would kill Vo's family. Vo testified that both men made the threat and Vo thought Dennis said it more than once. At some point, Dennis punched, kicked, and stepped on Vo many times. Later, Dennis stepped on the back of Vo's head and on Vo's back, wrapped a tie around Vo's neck, and pulled Vo up with the tie, choking him. After Dennis choked Vo with the tie, Dennis pointed the knife at Vo. Vo was told not to call the police or his family would be killed. Based on Vo's testimony alone, there was sufficient evidence to convict Dennis of Robbery in the First Degree.

### 2. Kidnapping

HRE § 707-720 provides:

> §707-720 **Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
> . . . .

---

[4] The circuit court instructed the jury on accomplice liability. Under HRS § 702-221 (1993), "[a] person is guilty of an offense if it is committed by his own conduct or by the conduct of another person" when "[h]e is an accomplice of such other person in the commission of the offense."

(c)   Facilitate the commission of a felony[.]

The evidence summarized in part III.C.1., plus Vo's testimony that Dennis drove the van from urban Honolulu to Kaneohe, provides sufficient evidence for Dennis's Kidnapping conviction.

### 3.   UCPV

HRS § 708-836 provides in relevant part:  "A person commits the offense of [UCPV] if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent[.]" At trial, Dennis testified that he drove the van, and Vo testified that the van belonged to him and he had not given Dennis permission to drive it.  There was sufficient evidence to support the UCPV conviction.

### D.   KIDNAPPING CONVICTION, CLASS OF FELONY

Dennis contends the circuit court erred in convicting him of Kidnapping as a Class A rather than a Class B felony because he released Vo in a safe place.  Without reviewing whether Dennis released Vo in a safe place, we hold that the circuit court did not abuse its discretion in convicting Dennis of Class A Kidnapping because the jury found that when Dennis released Vo, Vo was suffering from serious or substantial bodily harm.

HRS § 707-720(3) provides:  "In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial."

Vo testified at trial that he was unconscious before Dennis, William, and Barbara left the van, regained consciousness as they were leaving, and after they left, "had no more energy just to sit up."  Vo thought the police arrived about seven to ten minutes later.  At trial, Dr. Saltman testified that he examined Vo after the incident and Vo had "multiple abrasions and contusions that were scattered about the head and neck and upper . . . body area.  He had abrasions on his forehead.  He had a bruise [sic] tongue."  Dr. Saltman stated that Vo's injuries were

consistent with Vo's statement to him that Vo had been kidnapped and beaten up. Vo complained of pain in the head, neck, and upper back area. Vo later complained that his voice had changed and he was having trouble swallowing. In connection with the police investigation of this case, Dr. Saltman filled out a police form in which he indicated that Vo had suffered a serious concussion as a result of the incident. The doctor also testified that Vo's concussion coupled with Vo's loss of consciousness of unknown duration created a substantial risk of death.

In response to a special interrogatory regarding whether Dennis had committed Class A or B Kidnapping, the jurors were asked, among other things, whether the State had "proven beyond a reasonable doubt that prior to trial Dennis Brooks did not release Tuan Vo alive and not suffering from serious or substantial bodily injury." The jury responded, "Yes." On appeal, Dennis does not dispute the jury's finding. Because the requirements of HRS § 707-720(3) are set out in the conjunctive, rather than the disjunctive, the State needed only to disprove one element beyond a reasonable doubt. The State disproved the second element of the statute.

## IV.

The Judgment of Conviction and Sentence filed on December 9, 2008 in the Circuit Court of the First Circuit is affirmed.

On the briefs:

Dean K. Young
for Defendant-Appellant.

Delanie D. Prescott-Tate,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.